**PUBLISH**
**UNITED STATES COURT OF APPEALS**
Filed 1/7/97
**TENTH CIRCUIT**

THUNDER BASIN COAL
COMPANY,

        Plaintiff-Appellee,

v.

SOUTHWESTERN PUBLIC
SERVICE COMPANY,

        Defendant-Appellant.

No. 95-8050

Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 93-CV-304)

Charles R. Watson, Jr. (Stephanie Landry with him on the brief) of Hinkle, Cox, Eaton, Coffield & Hensley, P.L.L.C., Amarillo, Texas, for Defendant-Appellant.

David K. Isom of David K. Isom & Assoc., Salt Lake City, Utah, (J. Preston Stieff of David K. Isom & Assoc., Salt Lake City, Utah, Scot W. Anderson, Atlantic Richfield Co., Denver, Colorado, and Thomas F. Nicholas, Hirst & Applegate, Cheyenne, Wyoming, with him on the brief) for Plaintiff-Appellee.

Before **HENRY, LIVELY,**[*] and **MURPHY,** Circuit Judges.

**MURPHY**, Circuit Judge.

Plaintiff-appellee, Thunder Basin Coal Company ("Thunder Basin"), brought suit alleging defendant-appellant, Southwestern Public Service Company ("Southwestern"), intentionally interfered with a contractual relationship between Thunder Basin and TUCO, Incorporated ("TUCO"), causing TUCO to partially repudiate its obligations. Thunder Basin further alleged that Southwestern was contractually obligated to guarantee TUCO's performance and had failed to do so. The case proceeded to trial and the jury returned a verdict in favor of Thunder Basin in the amount of $18,815,802. Southwestern timely appealed.

On appeal, Southwestern argues the district court erred when it determined TUCO was not an indispensable party. It also challenges the sufficiency of the evidence supporting several of the jury's specific findings. In addition, Southwestern claims no case or controversy exists and that the district court's judgment in favor of Thunder Basin constitutes merely an advisory opinion. This court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and affirms. We

---

[*]The Honorable Pierce Lively, Senior Circuit Judge, Sixth Circuit Court of Appeals, sitting by designation.

specifically hold that an entity or individual subject to impleader under Fed. R. Civ. P. 14 and entitled to intervene under Fed. R. Civ. P. 24 is never an indispensable party under Fed. R. Civ. P. 19.

## I. BACKGROUND

This diversity suit focuses on the amount of coal to be purchased under one of two 1976 coal-supply agreements and primarily involves three companies. The first company, Thunder Basin, mines coal from the Powder River Basin in Wyoming and is a subsidiary of the Atlantic Richfield Company ("ARCO").[1] ARCO originally entered into the coal-supply agreements at issue here but subsequently assigned its interests in them to Thunder Basin.[2] The second company is Southwestern, a publicly regulated electric utility organized under New Mexico law and operating principally in Texas. Since at least 1983, Southwestern has operated three coal-fired, electric-generating plants in Texas. In 1976, ARCO entered into the coal-supply agreements with the third main company, TUCO. TUCO has been a subsidiary of Massachusetts-based Cabot Corporation since 1979. Prior to 1979, however, and at the consummation of these agreements, TUCO was a subsidiary of Southwestern. To this day, TUCO

---

[1]ARCO is not a party to this suit.

[2]The parties raised no issues concerning ARCO's assignment before the district court and it is not at issue here on appeal.

remains the exclusive supplier of coal to Southwestern. TUCO is not a party to this suit. It is that procedural fact which is at the center of this controversy.

Prior to entering into the agreements which form the basis of this suit, the three companies dealt with each other under a different coal-supply agreement. In 1973, ARCO entered into a long-term contract with Southwestern (the "1973 Agreement"). Soon thereafter, however, environmental litigation halted mining on certain federal lands and caused ARCO to be unable to meet its coal-supply obligations under the 1973 Agreement. Subsequent negotiations between the parties resulted in two separate, long-term, coal-supply agreements. The first agreement involved the sale of coal mined from state lands (the "State Agreement") and the second involved the sale of coal mined from federal lands (the "Federal Agreement"). For purposes of these two agreements, Southwestern created TUCO as a wholly owned subsidiary which would purchase coal for Southwestern. Both agreements were signed on or about February 20, 1976, and both involved the sale of coal to TUCO for Southwestern's use in Texas.

The State Agreement, which contained a significantly higher base price for coal than the 1973 Agreement, provided that TUCO would buy 13,800,000 tons of coal between 1978 and 1983. Under the Federal Agreement, TUCO agreed to purchase coal from ARCO commencing in 1983, after the conclusion of the State Agreement. The Federal Agreement, which contained both an original term and

an extension period, provided during its initial term for the purchase of 3,000,000 tons of coal per full year of the contract's operation, subject to increases or decreases of up to 15% per calendar year.

As compensation for TUCO's purchase of the more expensive state coal, the Federal Agreement provided TUCO with the opportunity to buy an additional volume of the cheaper federal coal during an extension period after the initial term of the Federal Agreement expired in 1994. Section 2(b) of the Federal Agreement, which concerned this extension period, provided:

> The initial term of this Agreement shall be extended for the period necessary for [TUCO] to take quantities of coal equal to the quantities of coal delivered to [TUCO] under [the State Agreement] dated February 20, 1976 . . . .
>
> . . . .
>
> Such quantities of coal shall be delivered under the terms and conditions of this Agreement and in accordance with the delivery schedule in effect at the time of delivery; provided, however, that (A) [TUCO] shall not be entitled to take more than 13,800,000 tons of coal during this extension of the initial term and (B) if [TUCO] has not taken delivery of the total quantity of coal to which it is entitled under this Section 2(b) by December 31, 1997, [TUCO's] right to take such coal shall terminate as of midnight, December 31, 1997 and the initial term shall expire as of such date.[3]

---

[3]Neither party disputes that TUCO exercised the option under Section 2(b). Instead, the dispute centers solely around the amount of coal that TUCO agreed to purchase when it exercised the option.

Under a separate agreement, Southwestern guaranteed TUCO's performance of the terms of the Federal Agreement (the "Guarantee Agreement"). After Southwestern sold TUCO to Cabot Corporation in 1979, TUCO continued to supply coal to Southwestern's Harrington Station plant; Southwestern's obligations under the Guarantee Agreement were not altered by the sale of TUCO.

The central dispute before the district court involved the amount of coal TUCO agreed to purchase under the section 2(b) extension of the Federal Agreement. In the course of discussions prior to the expiration of the Federal Agreement, Thunder Basin asserted that the total volume of coal to be purchased was 12,861,993 tons. This amount is equal to the amount TUCO had actually purchased under a contractual measuring period set out in the State Agreement. Eventually, however, Thunder Basin learned the parties disagreed over the amount. TUCO and Southwestern maintained the amount to be purchased was 1,000,000 tons per year per coal-fired unit, or 9,000,000 tons total. As a result, TUCO, Southwestern, and Thunder Basin held a meeting in August 1993 concerning the amount of coal to be purchased during the extension period. After this meeting, at which the parties continued to insist upon their respective interpretations, Thunder Basin filed a Complaint against TUCO and Southwestern in the United States District Court for the District of Wyoming.

The Complaint alleged as follows: TUCO was required to purchase 12,861,993 tons of coal for the period 1995-97; TUCO's refusal to purchase that amount constituted a breach and partial repudiation of the Federal Agreement; and Southwestern breached and repudiated its guarantee of TUCO's performance. Both TUCO and Southwestern moved the court to dismiss Thunder Basin's Complaint for lack of diversity jurisdiction, inasmuch as both plaintiff Thunder Basin and defendant TUCO were Delaware corporations. Thunder Basin responded with an Amended Complaint, pursuant to Fed. R. Civ. P. 15(a), which dropped TUCO as a party.

Thunder Basin's Amended Complaint involved somewhat different claims from its original Complaint. The Amended Complaint alleged the following: (1) TUCO partially repudiated its obligations to purchase 12,861,998 tons of coal between 1995 and 1997; (2) Southwestern refused to perform its guarantee obligations to Thunder Basin which arose as a result of TUCO's partial repudiation of the Federal Agreement; (3) Southwestern intentionally interfered in the relationship between Thunder Basin and TUCO at the time of the negotiations and thus caused TUCO to repudiate a portion of the Federal Agreement; and (4) Southwestern was liable for the entire amount of Thunder Basin's damages resulting from the partial repudiation as well as its costs, expenses, and fees.

In response to the Amended Complaint, Southwestern moved to dismiss under Fed. R. Civ. P. 19 for failure to join TUCO as an indispensable party. After the district court held that TUCO was a necessary but not indispensable party and denied Southwestern's motion, the case proceeded to trial. Southwestern has never moved to add TUCO as a party under Fed. R. Civ. P. 14 and TUCO has never sought to intervene under Fed. R. Civ. P. 24(a).

Before submitting the case to the jury, the district court determined the evidence did not support a claim that Southwestern "breached" its guarantee of performance. Nevertheless, the judge concluded that in the event of a jury determination that TUCO had partially repudiated the Federal Agreement, Southwestern would have a duty to pay and the judge would make such a declaration based on the jury's verdicts. Accordingly, Thunder Basin presented the jury with the following issues: TUCO's obligations under the Federal Agreement, TUCO's partial repudiation, and Southwestern's tortious interference with Thunder Basin's contractual relations with TUCO.

The jury returned a verdict for Thunder Basin. In its Special Verdict and Interrogatories, the jury found as follows: (1) TUCO agreed to purchase 12,861,993 tons of coal during the period 1995-97; (2) TUCO repudiated its duty to purchase the difference between 12,861,993 tons and 9,000,000 tons and failed to retract its repudiation; and (3) Southwestern intentionally interfered with the

Federal Agreement. The jury found that Thunder Basin had suffered $18,815,802 in damages as a result of the actions of TUCO or Southwestern. Southwestern appeals.

On appeal, Southwestern raises a number of issues which can be summarized under four categories. First, Southwestern argues TUCO was indispensable because each of Thunder Basin's claims required a determination of TUCO's obligations and its intent regarding those obligations. Second, Southwestern contends the evidence does not support the jury's verdict that TUCO repudiated its obligations to purchase coal during the extension period. Third, Southwestern argues the evidence does not support the jury's finding that Southwestern interfered with the Federal Agreement during the negotiations over the amount of coal to be purchased during the extension period. And fourth, Southwestern contends the district court's entry of judgment on the verdict is merely advisory because after the district court determined Southwestern did not breach its guarantee, there remained no case or controversy concerning Southwestern's liability.

## II. ANALYSIS

Initially, the court notes the Federal Agreement specifies Wyoming law as the governing substantive law and neither party challenges that proposition.

## A. Indispensability

The district court held TUCO was a necessary party under Fed. R. Civ. P. 19(a) but not an indispensable party under Fed. R. Civ. P. 19(b). Southwestern challenges the latter determination. A district court's determination of indispensability under Rule 19(b) is reviewed for an abuse of discretion. "Since evaluation of indispensability 'depends to a large degree on the careful exercise of discretion by the district court,' we will only reverse a district court's determination for abuse of that discretion." *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1471 (10th Cir. 1987) (quoting *Glenny v. American Metal Climax, Inc.*, 494 F.2d 651, 653 (10th Cir. 1974)); *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1549 (10th Cir. 1993).

Rule 19(b) sets forth the following factors for determining whether an entity or individual is indispensable:

> first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Because Rule 19(b) does not state the weight to be given each factor, the district court in its discretion must determine the importance of each in the context of the particular case. *Glenny*, 494 F.2d at 653.

Unfortunately, Southwestern does not fully argue any of the factors set out in Rule 19(b) before this court.[4] Nevertheless, because the issue of indispensability is one which the court has an independent duty to raise *sua sponte*, we now turn to that question. *Enterprise Management Consultants, Inc. v. United States*, 883 F.2d 890, 892 (10th Cir. 1989).

In *Pasco Int'l (London) Ltd. v. Stenograph Corp.*, the Seventh Circuit addressed the issue of indispensability under Rule 19(b). 637 F.2d 496 (7th Cir. 1980). *Pasco* involved claims of breach of contract, interference with contractual relations, and interference with prospective economic relations. *Id.* at 499. The plaintiff originally brought suit against three corporations and their agent but this first action was dismissed for lack of diversity between the plaintiff and the

[4]Instead, Southwestern makes an amalgam of arguments for why, in its view, the district court's holding that TUCO was not indispensable caused the court to hear a case beyond its subject matter jurisdiction. Most of these arguments are irrelevant; none are convincing. It is sufficient to state that Southwestern's attempt to frame the question of Rule 19(b) indispensability in terms of subject matter jurisdiction necessarily fails. The issue of indispensability under Rule 19(b) is not a jurisdictional question. 7 Charles A. Wright et al., Federal Practice and Procedure § 1611, at 171-74 (2d ed. 1986). To the extent that Southwestern's argument alleges that TUCO is prejudiced by being absent, prejudice to TUCO is an appropriate factor under Rule 19(b) and is considered later in this opinion.

defendant agent. *Id.* at 499 n.1. The plaintiff then brought a second suit against the same corporations but chose not to name the agent, the actual person whose conduct was challenged. *Id.* at 499. The district court dismissed the suit for failure to join the agent, finding him indispensable. *Id.*

In reversing the district court, the Seventh Circuit conceded the availability of state court as an alternate forum. *Id.* at 501. Nevertheless, the court held that availability an insufficient reason to dismiss under Rule 19(b). According to the court, the plaintiff had an interest, granted by federal law, in the chosen federal forum. *Id.* Thus, a competing interest of the nonparty, a party, or the judicial system was needed in order to outweigh the plaintiff's interest in its chosen forum. *Id.*

As to the competing interest of the nonparty agent, the court noted that despite a lack of diversity of citizenship, the agent could intervene under Fed. R. Civ. P. 24(a) if he was a necessary party under Rule 19(a) and the defendants did not adequately protect his interest. *Id.* at 502 n.13. As to the competing interests of the defendants, the court held that the availability of third-party practice/impleader under Fed. R. Civ. P. 14 demonstrated the agent was not indispensable under Rule 19(b). *Id.* at 503. Underlying the Seventh Circuit's decision is this proposition: if the defendant is capable of bringing into the litigation a nonparty whose presence is allegedly required to fully resolve the

controversy and if that nonparty is otherwise capable of intervening, then the nonparty cannot be considered indispensable under Rule 19(b). *See id.* at 503; *see also Boone v. General Motors Acceptance Corp.*, 682 F.2d 552, 553-54 (5th Cir. 1982) (holding that person subject to impleader cannot be indispensable party); *cf. Associated Dry Goods Corp. v. Towers Fin. Corp.*, 920 F.2d 1121, 1124 (2d Cir. 1990) (holding defendant's ability to assert compulsory counterclaim against plaintiff under Fed. R. Civ. P. 13(a) and to add absent nonparty to counterclaim prevented defendant from claiming nonparty was indispensable under Rule 19(b)).[5]

We find the reasoning of *Pasco* persuasive and applicable. Each of the concerns referenced in Rule 19(b) would be resolved if TUCO were a party to this case.[6] TUCO was free to seek mandatory or permissive intervention under Rule 24. It chose not to do so. Southwestern, which at oral argument acknowledged it had a claim against TUCO for damages awarded, could have brought TUCO into this litigation by impleader under Rule 14(a). It too chose not to do so.

---

[5]We leave for another day the question whether the availability of impleader or intervention, standing alone, is sufficient to make that nonparty not indispensable for purposes of Fed. R. Civ. P. 19(b).

[6]Factor three, whether the remedy rendered in the nonparty's absence will be adequate, is not pertinent in the context of this case. Factor four, available relief in another forum, was addressed in *Pasco* and deemed nondispositive when the nonparty is entitled to intervene and is subject to impleader. 637 F.2d at 503. In the context of this case, we agree.

Based on the way this litigation unfolded and the way it was presented on appeal, we understand why there was no effort to make TUCO a party. Southwestern desperately wanted this litigation to proceed in Texas and was unwilling to take any measures inconsistent with this desire. Accordingly, Southwestern was not about to join TUCO as a party under circumstances where TUCO's non-diverse citizenship was consistent with and did not destroy the district court's jurisdiction.[7] Foregoing its right to implead TUCO under Rule 14,

---

[7]Diversity jurisdiction would not be destroyed in this case if TUCO became a party as a result of joinder under Rule 14 or intervention under Rule 24. 28 U.S.C. § 1367. Section 1367(a) provides as follows:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

We note, however, that Thunder Basin could not utilize TUCO's joinder or intervention as an avenue to escape the limitations of the district court's diversity jurisdiction and assert its own claims against TUCO. Section 1367(b) provides as follows:

> In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title [diversity jurisdiction], the district courts shall not have supplemental jurisdiction under subsection (a) over claims made by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure . . . .

-14-

however, belies Southwestern's claim of indispensability under Rule 19(a). Even if we did not have *Pasco* upon which to rely for this proposition, we would be willing to stand first and alone.

### B. Sufficiency of the Evidence

We next turn to Southwestern's challenges to the sufficiency of the evidence supporting the jury's verdicts. "When a jury verdict is challenged on appeal, our review is limited to determining whether the record—viewed in the light most favorable to the prevailing party—contains substantial evidence to support the jury's decision." *Comcoa, Inc. v. NEC Tels., Inc.*, 931 F.2d 655, 663 (10th Cir. 1991). "The jury . . . has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact." *Kitchens v. Bryan County Nat'l Bank*, 825 F.2d 248, 251 (10th Cir. 1987).[8]

---

[8]We are puzzled by Southwestern's attempt to characterize its sufficiency-of-the-evidence claims as purely legal questions requiring *de novo* review. Although Southwestern fails to point to any specific errors of law on the part of the district court in instructing the jury in this case, Southwestern nevertheless argues that the jury's findings are based upon mistakes of law made by the district court and that *de novo* review is therefore appropriate. Any purported mistakes asserted by Southwestern, however, are in the application of the facts to the law; nowhere does Southwestern allege that the district court misinformed the jury about the law or failed to instruct the jury properly about any element of Thunder

## 1. Repudiation

Southwestern maintains the evidence is not sufficient to support the jury's verdict that TUCO repudiated its obligations to purchase coal during the extension period. In addition, Southwestern contends that even if TUCO did repudiate its obligations, the evidence conclusively shows that TUCO retracted its repudiation.

At least four different scenarios may constitute repudiation under Wyoming law. Wyoming's version of the Uniform Commercial Code provides that repudiation may result from any one of the following: (1) an "overt communication of intention . . . not to continue with performance"; (2) an "action which . . . demonstrates a clear determination not to continue with performance"; (3) an "action which reasonably indicates a rejection of the continuing obligation"; or (4) "a demand . . . for more than the contract calls for" which, "under a fair reading[,] . . . amounts to a statement of intention not to perform

Basin's claims or any possible defenses. Instead, Southwestern argues that the facts, as Southwestern culls them from the record, do not constitute repudiation by TUCO or intentional interference with contractual relations by Southwestern. As such, we treat these claims as specific arguments for the proposition that the evidence is not sufficient to support the jury's findings. In the absence of specific errors of law, the determinations by the jury concerning both repudiation and intentional interference are accorded only limited, not *de novo*, review by this court.

-16-

except on conditions which go beyond the contract." Wyo. Stat. § 34.1-2-610

cmts. 1-2 (1977).[9]

The test for partial repudiation, upon which Thunder Basin bases its claim,

is whether the aggrieved party suffered substantial impairment of the value of the

contract. *Id.* cmt. 3. Under Wyoming law, "'in order to predicate a cause of

action upon an anticipatory breach, the words or conduct evidencing the breach

must be *unequivocal and positive in nature*.'" *J.B. Serv. Court v. Wharton*, 632

P.2d 943, 945 (Wyo. 1981) (quoting 17 Am. Jur. 2d Contracts § 448 (1964))

(emphasis in original).

Concerning retraction of a party's repudiation, Wyoming law provides:

> (a) Until the repudiating party's next performance is due
> he can retract his repudiation unless the aggrieved party
> has since the repudiation canceled or materially changed
> his position or otherwise indicated that he considers the
> repudiation final.
>
> (b) Retraction may be by any method which clearly
> indicates to the aggrieved party that the repudiating
> party intends to perform . . . .

Wyo. Stat. § 34.1-2-611 (1977).

---

[9]Wyoming has adopted the official comments to the Uniform Commercial Code and Wyoming courts rely upon them to interpret provisions of the Code. *See, e.g.*, *New Oil, Inc. v. First Interstate Bank of Commerce*, 895 P.2d 871, 874 n.2 (Wyo. 1995).

Southwestern maintains the evidence does not establish a clear and unequivocal renunciation of TUCO's contract obligations. Instead of marshaling all the evidence in the record and pointing out why it does not support the jury's findings, Southwestern points only to evidence that supports its view of the case. It then contends this evidence is contrary to the verdict, demonstrating either no clear renunciation or clearly showing retraction of TUCO's repudiation. It is the province of the jury, however, and not that of this court, to resolve conflicting evidence and to appraise credibility. *Kitchens*, 825 F.2d at 251. The jury has the power to accept or reject any particular evidence presented. *United States v. Mason*, 85 F.3d 471, 472-73 (10th Cir. 1996). Thus, the mere existence of contrary evidence does not itself undermine the jury's findings as long as sufficient other evidence supports the findings.

Applying these principles to the present case, we conclude there was sufficient evidence to support the jury's verdict that TUCO repudiated its contractual obligations and that TUCO failed to retract its repudiation. Viewing the evidence in a light most favorable to Thunder Basin, we note testimony that at the August 1993 meeting of Thunder Basin, TUCO, and Southwestern, TUCO clearly indicated it would not take more than 9,000,000 tons of coal during the extension period. In addition, Southwestern's representative admitted that at this meeting Southwestern and TUCO communicated they were unwilling to bend on

-18-

the volume of coal to be purchased during this period. There was also testimony and evidence that TUCO and Southwestern refused to schedule delivery of more than 9,000,000 tons of coal unless ordered to do so by a court. Record testimony also indicates that prior to the August 1995 meeting TUCO believed its obligations under the Federal Agreement required its purchase of 12,861,993 tons of coal. These pieces of evidence manifest TUCO's refusal to perform obligations unless ordered to do so by a court.

From all of this evidence, the jury could reasonably have concluded that TUCO unequivocally and positively manifested its intent to perform its obligations only in accordance with its own interpretation of the Federal Agreement and that a repudiation had consequently occurred. The fact intensive cases cited by Southwestern, *See, e.g.*, *J.B. Serv.*, 632 P.2d at 945, where the Wyoming Supreme Court held that the evidence was clear and did not amount to a renunciation or termination of the contract, are inapposite.

With respect to the evidence of TUCO's purported retraction, Southwestern contends that an April 5, 1994, letter which TUCO sent to Thunder Basin effectively retracts any repudiation. In this letter, TUCO stated that it "has always intended to fulfill its obligations under the [Federal] Agreement as they may ultimately be determined by a court of competent jurisdiction." Furthermore, the letter stated TUCO never intended to communicate that it would refuse to

perform its obligations and any statements to that effect were withdrawn. The jury's reading of that letter, however, could have been and apparently was different from that suggested by Southwestern. For example, the jury could have reasonably determined the letter was but another indication that TUCO refused to perform its obligations unless ordered to do so by a court and was not, therefore, a retraction at all. TUCO's April 5, 1994 letter is not evidence that undermines the verdict.

2. Intentional Interference

Southwestern also challenges the sufficiency of the evidence to support the jury's verdict that Southwestern interfered with the Federal Agreement during negotiations over the amount of coal to be purchased during the extension period. Additionally, Southwestern argues that ambiguous contractual provisions are not subject to interference as a matter of law and, therefore, Thunder Basin's tort claim should not have been submitted to the jury.

The evidence in this case indicates that the price of coal on the open market in August 1993 was significantly lower than the amount specified in the Federal Agreement—approximately $4 per ton on the market and about $11 per ton in the contract. Representatives of Thunder Basin testified at trial that when they met solely with representatives of TUCO prior to the August meeting, TUCO's representatives expressed no disagreement with its obligation to purchase

12,861,993 tons. The evidence also supports the view that TUCO changed its position regarding the amount to be purchased under the extension period only when Southwestern became involved in the discussions. Furthermore, the evidence shows that Southwestern asserted its Harrington Station plant could not possibly burn the higher volume of coal. Despite this assertion, a representative of TUCO testified that the amount of coal needed at Harrington Station during the extension period of 1995-97 was approximately 4.4 million tons a year, almost exactly the volume found by the jury. On these bases, we conclude the evidence was sufficient for the jury to find that Southwestern intentionally interfered with the contractual relations between TUCO and Thunder Basin regarding the volume of coal TUCO was to purchase during the extension period. Moreover, we conclude the implicit finding by the jury that this interference was improper or in bad faith is sufficiently supported by the record.

Southwestern's argument that ambiguous contracts are not subject to interference fails in light of applicable Wyoming law. In *Carlson v. Carlson*, the plaintiff brought a claim of tortious interference with contract against defendant Citizens Bank. 775 P.2d 478, 478-79 (Wyo. 1989). The district court granted summary judgment to Citizens Bank, holding as a matter of law that because no contract existed there was nothing with which Citizens Bank could interfere. *Id.* at 481. The Wyoming Supreme Court reversed, holding that the documents at

issue were ambiguous and that a genuine issue of fact existed as to the parties' intent. *Id.* at 483-84. The court went on to note that should the jury find a valid contract, it should then move on to determine the issue of tortious interference with contract. *Id.* at 484. Applying the reasoning of *Carlson*, the jury here was free to find contractual interference even if pertinent contractual provisions were ambiguous.

### C. The Basis of Southwestern's Liability

Southwestern contends that once Thunder Basin's breach of guarantee claim was dismissed, there no longer existed a case or controversy. This contention is untenable. What Southwestern fails to acknowledge is that Thunder Basin alleged and proved Southwestern intentionally interfered with the contract between TUCO and Thunder Basin. This claim, which is independent of Thunder Basin's claim against Southwestern for breach of the Guarantee Agreement, clearly presents a justiciable case for presentation to the jury. Furthermore, although the district court concluded that Southwestern had not "breached" the Guarantee Agreement, it did not absolve Southwestern of liability under that agreement. Instead, the district court held that it would declare and enforce Southwestern's obligations under the Guarantee Agreement if the jury decided that TUCO had breached the Agreement. This task became unnecessary,

however, after the jury found for Thunder Basin on the intentional interference with contract claim.  Southwestern's jurisdictional claim is without merit.


## III.  CONCLUSION

For the foregoing reasons, the judgment of the district court entering the jury's Special Verdict and Interrogatories is **AFFIRMED**.