**P.D. UPTON, an Underwriter at Lloyd's of London, on his own Behalf and on Behalf of Those Certain Underwriters at Lloyd's of London subscribing to Certificate No. TA42735, Appellants.**

v.

**Elden GINN and Elden Ginn Tobacco Warehouses, Inc., Appellees.**

No. 2005–CA–001062–MR.

Court of Appeals of Kentucky.

Aug. 10, 2007.

Todd S. Page, Stoll, Keenon Ogden, PLLC, Lexington, KY, for appellant.

Gregory L. Monge, VanAntwerp, Monge, Jones & Edwards, Ashland, KY, for appellee.

Before ABRAMSON and TAYLOR, Judges; KNOPF,[1] Senior Judge.

## OPINION

ABRAMSON, Judge.

P.D. Upton, on behalf of Lloyd's of London, appeals from the April 5, 2005 Findings of Fact and Conclusions of Law entered by the Montgomery Circuit Court finding that Elden Ginn and Elden Ginn Tobacco Warehouses, Inc. (collectively "Ginn") did not repudiate a contract to purchase tobacco from Lloyd's, and further adjudging Lloyd's liable to Ginn for wrongfully selling a portion of that tobacco to a third party after it had previously been sold to Ginn. Upton also appeals the trial court's April 22, 2005 Order denying Lloyd's motion to alter, amend or vacate. Finding no error, we affirm.

On February 6, 1998, the weight of new-fallen snow caused the roof of the Farmers Tobacco Warehouse in Mt. Sterling, Kentucky, to collapse. At the time, the warehouse was filled with hundreds of thousands of pounds of tobacco awaiting sale. Both the warehouse and its contents were insured by Lloyd's. In an attempt to salvage at least some of the tobacco, Lloyd's

---

1. Senior Judge William L. Knopf sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5) of the Kentucky Constitution and KRS 21.580.

held a sealed-bid auction ten days following the warehouse collapse. Ginn was among the bidders.

Following an inspection of the tobacco, Ginn successfully submitted the high bid for the tobacco, $0.71 per pound. On February 20, 1998, Ginn tendered a check to Lloyd's in the amount of $177,500.00, representing advance payment of one-half of the estimated value of the damaged tobacco. When Ginn arrived three days later to begin the process of removing the tobacco, he concluded that between 10,000 and 12,-000 pounds of "good tobacco" had already been removed from the warehouse and replaced with poor quality "junk" tobacco. Nonetheless, Ginn's employees began preparing and removing the tobacco using pallets, a forklift and a tobacco press that were brought in for the task. The process continued between February 23–28, 1998, with an additional load being removed on March 3. Ginn then advised Lloyd's that he would not be able to remove any tobacco during the period March 4–8, 1998, due to a previously scheduled machinery show in Maysville, Kentucky, that he was sponsoring. Ginn also indicated that removal had to cease during the show because his equipment was needed for use in conjunction with the show, and further because his available storage space for the tobacco was temporarily filled with show-related equipment. When Ginn removed his employees and his equipment from the Mt. Sterling warehouse to Maysville, he left behind approximately forty-three pallets of tobacco (approximately 90,000 pounds) that were ready for removal as well as numerous additional empty pallets and thousands of pounds of stacked but not yet palleted tobacco.

Upon the return of Ginn's representative to the tobacco warehouse following the conclusion of the machinery show, he discovered that the doors were chained and locked. Ginn subsequently learned that during his absence, Lloyd's had sold the remaining tobacco to a third party, Mack Bailey, at the rate of $0.05 per pound. Lloyd's subsequently initiated this action against Ginn, contending that it was forced to sell the tobacco because Ginn repudiated his contract and abandoned the remaining tobacco. Lloyd's sought to recover from Ginn the difference between the unpaid contract amount and the amount actually received from Bailey.

Following a bench trial, the trial court rendered Findings of Fact and Conclusions of Law on April 5, 2005, in which it found that Ginn did not abandon its contract and Lloyd's had no authority to resell to Bailey any of the tobacco Ginn had previously purchased. The trial court further found that Lloyd's sale to Bailey was not commercially reasonable because Lloyd's failed to provide any notice of it to Ginn. Ginn was awarded $16,506.79, representing the amount that Ginn had paid for tobacco that he did not receive. This appeal followed.

■ Lloyd's argues that the trial court's findings were erroneous in that Ginn himself testified that he repudiated the contract. According to Lloyd's, Ginn testified at trial that he refused to remove all of the tobacco he had purchased unless Lloyd's agreed to adjust the price to reflect the alleged disappearance of approximately 12,000 pounds of high quality tobacco shortly after the auction. Characterizing Ginn's testimony as proof of his intention to repudiate the contract, Lloyd's contends that it was justified in treating the tobacco remaining in the warehouse as abandoned and, consequently, in offering it for sale to a third party.

Our review of the trial court's findings is governed by Kentucky Rule of Civil Procedure (CR) 52.01 which provides, in pertinent part, that "[f]indings of fact shall not

be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *See also Largent v. Largent*, 643 S.W.2d 261 (Ky.1982); *Taylor v. Taylor*, 591 S.W.2d 369 (Ky.1979); *Alvey v. Union Inv., Inc.*, 697 S.W.2d 145 (Ky.App.1985). Whether a contract has been anticipatorily repudiated is a question of fact. Leibson & Nowka, *The Uniform Commercial Code of Kentucky* § 2.06[2] (3rd ed.2004), citing *Thunder Basin Coal Co. v. Southwestern Pub. Serv. Co.*, 104 F.3d 1205 (10th Cir.1997). However, in making that factual determination, the fact-finder must be guided by Kentucky law regarding anticipatory repudiation.

KRS 355.2–610 provides:

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

(a) for a commercially reasonable time await performance by the repudiating party; or

(b) resort to any remedy for breach (KRS 355.2–703 or 355.2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(c) in either case suspend his own performance or proceed in accordance with the provisions of this article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (KRS 355.2–704).

The Official Comment to this section states that "anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." [2] U.C.C. § 2–610 (1958), Official Comment 1. The words or facts alleged to constitute the anticipatory repudiation must be "unequivocal." *Brownsboro Road Restaurant, Inc. v. Jerrico, Inc.*, 674 S.W.2d 40 (Ky.App.1984).

Turning then to the record, we first note that Ginn, in fact, did testify during the trial that he wanted an adjustment of the contract price due to his belief that over 10,000 pounds of high quality tobacco had been removed from the warehouse subsequent to the auction but before he began removal. Ginn also testified that without the price adjustment he would not remove the poor quality tobacco he termed "junk," *i.e.*, that tobacco he believed was placed in the location where the missing high quality tobacco originally was located. Despite the disagreement over the alleged missing tobacco and the price adjustment, however, Ginn also repeatedly stated during his testimony that he never intended to repudiate the contract or abandon the almost 100,000 pounds of tobacco remaining at the warehouse when he removed his equipment for use in his machinery show. Several times during his testimony he noted that between 40 and 50 pallets were fully loaded with good tobacco and awaiting transport when the previously scheduled machinery show temporarily halted the removal work. In addition to the palleted tobacco, Ginn also testified that he left in the warehouse a quantity of empty pallets that were intended for use after the machinery show as well as tens of thousands

---

**2.** In KRS 355.1–103(3), the Kentucky legislature provided that the Official Comments of the National Conference of Commissioners on Uniform State Laws "represent the express legislative intent of the General Assembly and shall be used as a guide for interpretation of this chapter, except that if the text and the official comments conflict, the text shall control." There is no conflict here.

of additional pounds of tobacco that had not yet been placed on them.

Clearly, the evidence before the trial court does not reflect an unequivocal intent on Ginn's part to repudiate his contract. On the contrary, Ginn's testimony demonstrates a dispute over a small percentage—less than 2%—of the tobacco purchased by him at the auction. His testimony also reveals that he did not intend to abandon the vast majority of the tobacco that was ultimately sold by Lloyd's to Bailey.[3] Thus, because there is "substantial and credible evidence" supporting the trial court's findings, we are foreclosed from setting them aside on appeal. *White v. Howard,* 394 S.W.2d 589 (Ky.1965).

Lloyd's next asserts that, even if Ginn did not expressly admit in his testimony that he abandoned the tobacco in the warehouse, his conduct constituted an anticipatory repudiation as a matter of law. According to Lloyd's, because Ginn expressly refused to remove the poor quality tobacco without an adjustment in the selling price, he necessarily breached the entire contract which required him to remove *all* of the tobacco. We disagree.

■ Under Kentucky law, the doctrine of anticipatory repudiation "requires unequivocal words or conduct evidencing an intent to repudiate the contract." *Brownsboro Road Restaurant, Inc. v. Jerrico, Inc., supra,* 674 S.W.2d at 42. As discussed above, the evidence before the trial court does not indicate Ginn's "unequivocal" intent to repudiate his contract with Lloyd's. Rather, both his testimony and his actions (*e.g.,* leaving palleted tobacco and empty pallets in the tobacco warehouse during the machinery sale and returning thereafter to continue with the removal) indicate an intent on his part to continue performance of his contractual obligations by removing the vast majority of the remaining tobacco from the warehouse.

■ Moreover, as quoted, *supra,* KRS 355.2–610 provides that in order for a party to a contract to take action based upon the alleged anticipatory repudiation of the contract by the other party, the other party's failure of performance must "substantially impair the value of the contract" to the party claiming the breach. *See Fredonia Broadcasting Corp., Inc. v. RCA Corp.,* 481 F.2d 781 (5th Cir.1973). There is *no* evidence in the record that had Ginn refused to remove the small quantity of allegedly substituted poor quality tobacco the value of the contract to Lloyd's would have been "substantially impair[ed]." There is also nothing in the record suggesting that if Lloyd's had refused to agree to a price adjustment that Ginn would have then refused to pay the full contract amount; Ginn simply refused to load and transport away the small percentage of poor quality tobacco—less than 2%—that he believed was substituted for good quality tobacco. Moreover, to the extent Lloyd's asserts that rejection of the poor quality tobacco substantially impaired the value of the contract, its position is undermined by the fact that Bailey, the subsequent purchaser, also did not remove the disputed poor quality tobacco but left it to be buried when the damaged warehouse was demolished. Under these circumstances we do not find that, as a matter of law, Ginn's actions constituted an anticipatory repudiation of the contract.

---

**3.** Interestingly, the testimony at trial indicates that the "junk" tobacco that was the subject of the parties' dispute was likewise rejected by Bailey. In fact, no party ever removed the approximately 10,000 to 15,000 pounds of "junk" tobacco. It was buried in the remains of the warehouse when it was later torn down.

Finally, in order for a privately consummated resale of goods to be commercially reasonable, notice must be provided to the original buyer of the intent to resell. KRS 355.2–706(3). It is undisputed that no notice was provided by Lloyd's to Ginn prior to the resale of the tobacco to Bailey. However, having found that the trial court correctly held that Lloyd's was not authorized to resell Ginn's tobacco in the first instance, we need not address the effect of Lloyd's failure to provide notice to him of the resale.

In conclusion, we find no error in the trial court's finding that Ginn did not repudiate his contract to purchase the tobacco in question from Lloyd's. Consequently, we affirm the April 5, 2005 Findings of Fact and Conclusions of Law of the Montgomery Circuit Court, as well as the April 22, 2005 Order denying Lloyd's motion to alter, amend or vacate.

ALL CONCUR.