F I L E D
United States Court of Appeals
Tenth Circuit

APR 28 2000

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED INTERNATIONAL
HOLDINGS, INC., a Delaware
corporation; and UIH ASIA
INVESTMENT COMPANY, a
Colorado general partnership,

    Plaintiffs-Appellees,

        v.

THE WHARF (HOLDINGS)
LIMITED, a Hong Kong company;
WHARF COMMUNICATIONS
INVESTMENTS LIMITED, a Hong
Kong company; WHARF CABLE
LIMITED, a Hong Kong company; and
STEPHEN NG, a Hong Kong citizen,

    Defendants-Appellants.
_____

PRODUCT LIABILITY ADVISORY
COUNCIL, INC.,

    Amicus Curiae.

No. 97-1421
No. 98-1002

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 94-K-2560)

Paul Michael Dodyk, of Cravath, Swaine & Moore, New York, New York

(William R. Jentes, of Kirkland & Ellis, Chicago, Illinois; and Scott R. Bauer, of Petrie, Bauer & Vriesman LLP, Denver, Colorado, with him on the brief), for the appellants.

Louis R. Cohen, of Wilmer, Cutler & Pickering, Washington, D.C. (Steven P. Finizio and Jonathan J. Frankel, of Wilmer, Cutler & Pickering, Washington, D.C.; David B. Wilson, of Holme, Roberts & Owen LLP, Denver, Colorado; and Jeffrey A. Chase, of Jacobs, Chase, Frick, Kleinkopf & Kelley, LLC, Denver, Colorado, with him on the brief), for the appellees.

Malcolm E. Wheeler and Lee Mickus, of Wheeler, Trigg & Kennedy, P.C., Denver, Colorado; and Hugh F. Young, Jr., Product Liability Advisory Council, Inc., Reston, Virginia, on the brief for the amicus curiae.

---

Before **BRORBY**, **HOLLOWAY**, and **BRISCOE**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

This case arises out of the award to defendant The Wharf (Holdings) Limited (Wharf) of a franchise to operate Cable Network Communications Limited (CNCL), a cable television system in Hong Kong. United International Holdings, Inc., (UIH) initiated this action against Wharf and one of its managing directors, Stephen Ng, claiming UIH had acquired an option to acquire 10% of the stock of CNCL and had been precluded from exercising its option. UIH asserted claims under Section 10(b) of the Securities Exchange Act of 1934, the Colorado Securities Act, and Colorado common law. Following an eleven-week trial, a jury found in favor of UIH and awarded $67,000,000 in compensatory damages and $58,500,000 in punitive damages. The district court awarded

2

$28,208,440 in prejudgment interest. During post-judgment proceedings, the district court held Wharf in contempt of court for failure to comply with the court's turnover order, sanctioned Wharf in the amount of $944,233.10, and awarded UIH post-judgment attorney fees of $144,457.91. Wharf appeals and we affirm.

## I.

**Background**

The government of Hong Kong publicized its intent to grant an exclusive license for operation of a cable television system in Hong Kong in 1991. Wharf had little experience in the cable industry and directed Ng to locate suitable business partners with telecommunications and cable television experience. Ng initiated discussions with NYNEX Network Systems Company (NYNEX) representative Paul Duffy, who agreed that NYNEX would review the telecommunications portion of Wharf's proposal. NYNEX had technical and business expertise in the cable television industry, particularly in relation to the design, installation, and maintenance of subscription television networks. NYNEX devoted its resources to this early phase of the project with the tacit understanding that if Wharf received the award and both Wharf and NYNEX were comfortable with the relationship and the project, NYNEX would have an opportunity to invest in the communications company or possibly garner an

3

operations and maintenance contract for its efforts.

Mark Schneider, vice president of UIH, met with Ng in early 1991. UIH is based in Denver, Colorado, and owns, operates, and invests in worldwide cable television systems. UIH representatives made it clear they were not interested in serving as a consultant on the project for a fee, but would commit their resources in exchange for a right to invest in CNCL if Wharf was awarded the license. Ng wrote to William Hudon of UIH on July 20, 1991, stating: "If as a result of our discussions you continue to be interested in co-investing in Wharf Cable's project in Hong Kong . . . I would appreciate hearing from you very soon." Appellants' Addendum at 31. In response to UIH overtures that it was interested in obtaining a greater ownership interest, Ng added: "Under the present rules in Hong Kong governing television franchises, a foreign company is not permitted to own more than 10% in the cable operator." Id. In October 1991, Schneider signed a confidentiality agreement on behalf of UIH, prohibiting UIH from divulging confidential and proprietary information provided by Wharf.

Ng and Schneider met in Singapore in June 1992 and Ng informed Schneider that Wharf had selected UIH as its cable partner. Ng also mentioned that Wharf was engaged in serious negotiations with NYNEX regarding a telephone partnership. According to Schneider, Ng did not expressly state that NYNEX's involvement was a prerequisite to any deal between UIH and Wharf.

4

Schneider recalled that Ng offered UIH a 10% ownership interest in CNCL. Schneider returned to Denver and sent a memo to the chair of the UIH board, stating: "It looks like we are in for 10% of the Hong Kong project."     Id. at 34.

Beginning in August 1992, several UIH employees, at UIH's expense, went to Hong Kong to assist Wharf in crafting the cable proposal, negotiating key contracts, designing the cable system, recruiting potential employees, and arranging financing. Hudon, UIH's financial specialist, contacted banks and other funding sources regarding UIH's 10% contribution obligation which would be triggered if UIH exercised its option.

UIH and Wharf drafted several letters of intent and shareholders' agreements. The initial letter of intent drafted by Wharf and submitted to UIH in early August recognized the "intention of the parties to cooperate together and invest in" the cable company for the purpose of preparing and submitting the license application and, hopefully, constructing, operating, and managing the cable television network.    Id. at 43.  Under the heading "Corporate Structure and Shareholdings," the draft provided that UIH would hold 10% of the company's share capital.   Id.  However, the draft letter provided: "This letter does not create legally binding and enforceable obligations and is intended to identify in general terms a number of the principal matters forming the basis of the cooperation between the parties."   Id.  The letter concluded:  "Each of the parties will

5

negotiate in good faith, and use all reasonable endeavors to conclude the terms of a formal, legally binding shareholders' agreement between them by not later than Friday 25th September, 1992." Id. at 46-47. Sonjia Norman, UIH's Hong Kong counsel, responded to this draft letter by advising UIH:

> "Our signing of the full Shareholder's Agreement after this letter of intent should be conditional upon: (a) our approval of the financial, operating and programming plans; (b) board consent on both sides; (c) award of the local franchise; (d) the subscription of NYNEX of 20% of Wharf Cable. (Mike [Fries, senior vice president of UIH], is this still our concern?)"

Id. at 48. The parties never signed a letter of intent.

Schneider went to Hong Kong in September 1992 during Wharf's final bid preparations. Ng expressed concern that NYNEX might withdraw and deal Wharf's chances a critical blow, and that UIH's unimpressive balance sheet would make Wharf's bid less attractive. Schneider offered to discuss UIH's financial status with Wharf's board and specifically inquired as to Ng's authority to "make this deal" on behalf of Wharf. At trial, Schneider testified that Ng expressed full authority to offer UIH a 10% right of investment, but no more. The parties were unable to consummate a shareholders' agreement before the deadline for the license application.

As the bid date came nearer, Wharf was increasingly uncomfortable with the lack of a signed letter of intent or a signed shareholders' agreement and the perceived weaknesses of its proposal. To demonstrate it had secured sufficient

6

technical expertise to construct and operate the system, Wharf entered into separate Technical Cooperation Agreements with NYNEX and UIH on September 25, 1992. The UIH agreement obligated UIH to do nothing until Wharf was awarded the license. The agreement acknowledged that Wharf "wishes to obtain the benefit of UIH's experience, and to engage UIH for the purpose of receiving assistance with respect to the administrative and technical operations of the subscription television system." Id. at 149. The agreement listed UIH's qualifications and duties with respect to construction and operation of the system, described UIH as "an independent contractor," and specified "UIH shall have no right or interest in the Company or in the CATV System, nor any claim or lien with respect thereto, arising out of this Agreement or the performance of its services hereunder." Id. at 156. The agreement specifically provided: "Notice of termination, changes and additions to this Agreement as well as any additional or supplemental agreements to this Agreement must be made in writing. Additional oral agreements are invalid. The requirement to use the written form may be waived only in writing." Id. at 160. Michael Fries, senior vice president of UIH, signed the Technical Cooperation Agreement on behalf of UIH. This is the only agreement that was signed by the parties during the course of their relationship. According to UIH, the agreement was simply a tool used to support Wharf's bid for the cable project. Fries, UIH's primary negotiator, specifically deleted a

7

section providing that the agreement "supersedes and invalidates all commitments, representations, warranties and other agreements relating to the subject matter hereof, . . . either orally or in writing prior to or contemporaneously with the date hereof." Appellees' Suppl. App. at 428. Fries characterized the agreement as part of a last minute filing strategy. He claimed Emil Fung, who was heavily involved in negotiations on behalf of Wharf, promised that notwithstanding the Technical Cooperation Agreement, the submitted bid would clearly identify UIH's right to invest. Fries testified at trial that he made it clear that UIH would not agree to the proposed Technical Cooperation Agreement approach without inclusion in the bid document of UIH's right to invest. UIH introduced a draft bid at trial that stated: "Wharf, as the 100% owner, has offered options to NYNEX and UIH to purchase up to 30% of the shares in CNCL." Id. at 403. Schneider authorized Fries to sign the Technical Cooperation Agreement after Fries viewed this draft bid. Fung testified at trial that UIH representatives were shown the final license application before it was submitted and did not object to its content.

On September 30, 1992, Wharf submitted the license application in its own name. The bid document contemplated "initial sole ownership and Board control by The Wharf (Holdings) Limited coupled with the technical cable expertise and experience of its two technical partners, NYNEX Network Systems Company and

8

United International Holdings, Inc."     Appellants' Addendum at 191.  Under the heading, "Ownership Structure," the bid provided: "If Wharf Cable is successful in its license application, Wharf will consider the introduction at the appropriate time of NYNEX, UIH and other strategic partners as co-investors to purchase up to 40% of the shares in CNCL."     Id. at 196.  UIH officials were concerned by the "noncommittal" language used by Wharf in the bid.  According to Schneider, Ng promised to resolve any problems when the parties met in Denver in October.

At a meeting on October 8, 1992, Ng allegedly requested that UIH continue to provide high level UIH employees until Wharf could hire suitable permanent employees.  UIH officials agreed to comply with this request if UIH's investment right in CNCL was "absolutely firm."  Ng allegedly agreed that in exchange for UIH's commitment to the project and continuing technical and support service, Wharf would grant UIH an option to invest.  The alleged terms of the right to invest were: (1) UIH had an option to purchase 10% of CNCL's stock; (2) UIH's option purchase price was 10% of the equity capital required to fund the project, less UIH's expenses and the value of UIH's previous services; (3) UIH's option was exercisable only if UIH demonstrated its ability to fund for 18 months its portion of the project's equity capital requirements; and (4) the option expired if not exercised by UIH within six months after Wharf received the franchise.  This agreement was not put in writing and, at trial, Ng denied

9

granting UIH a 10% option. Shortly after the meeting, UIH officials went to Hong Kong and Ng introduced UIH as Wharf's "strategic partner." In addition, Ng allegedly accompanied UIH officials to at least one bank meeting where the subject was UIH's attempt to raise money to invest in the cable company.

In October and November, Wharf and UIH exchanged three different drafts of proposed shareholders' agreements. The drafts all contained the following clause:

> This Agreement supersedes and invalidates all commitments, representations, warranties and other agreements relating to the subject matter hereof which may have been made by the Shareholders either orally or in writing prior to or contemporaneously with the date hereof, and which, if any exist, shall now become invalid from the date this Agreement becomes effective.

Id. at 252, 306. 388. Wharf and UIH could not reach an agreement on any of the drafts and they all remained unsigned.

In late December 1992, NYNEX informed Ng it was having difficulties "with the internal sale of this opportunity," and would "again examine the opportunity for investment" at service launch. Id. at 393. Ng disclosed NYNEX's tentative withdrawal to Schneider on January 14, 1993, and suggested that Wharf and UIH "defer ownership discussions but [Schneider] wanted to leave the door open . . . [and] talk to [Ng] in London at the end of next week." Id. at 394. After the London meeting, Schneider informed Ng that UIH "would

10

like to discuss having a stake in the venture in the 25% range provided that NYNEX is not going to participate in the business as an investor." Appellees' Suppl. App. at 610. Ng responded that "given the NYNEX situation, we should put ownership issues on hold until after service launch." Appellants' Addendum at 396.

UIH filed its Form S-1 Registration Statement with the Securities and Exchange Commission on April 21, 1993. The statement disclosed UIH's current and potential investments, and stated that upon award of the franchise to Wharf, UIH "will be entitled to acquire a minimum of 10% of the equity in Wharf Cable, with Wharf Holdings maintaining the remaining portion." Id. at 619. UIH and Wharf continued their discussions throughout the spring of 1993, but were unable to reduce an agreement to writing. This prompted Fries to submit a proposed "Memorandum of Understanding" to Wharf stating that acquisition of the shares of CNCL by UIH "is conditioned upon approval by both UIH and Wharf of" several documents, including "the terms of the Shareholders' Agreement." Id. at 401. This initial draft of the "Memorandum of Understanding" designated that, subject to the stated conditions, "UIH shall notify Wharf in writing of its intent to acquire" up to 20% of the shares of CNCL. Id. The final version stated "UIH will acquire a [10%] ownership interest in CNCL." Id. at 623. The percentage of UIH's potential ownership interest ranged from "up to 20% but not less than

11

10%," id. at 409, to 15%, and in the final version 10%. As with the letters of intent and the shareholders' agreements, the parties never signed any version of the Memorandum of Understanding.

On May 27, 1993, the Broadcasting Authority of the Hong Kong government awarded the franchise license to Wharf, effective June 1, 1993. UIH conducted a public offering and raised approximately $66,000,000 for its initial investment in CNCL. In late July or early August, UIH informed Ng it had satisfied the conditions of its option agreement and was ready to exercise its option.

Discussions regarding UIH's claimed right of investment were occurring inside Wharf. On August 11, 1993, Fung addressed a memorandum to Ng evaluating the "pros and cons of minority (10%) equity participation by United International Holdings in CNCL/Wharf Cable." Appellees' Suppl. App. at 700. He recommended "structuring a 10% UIH investment" in recognition of the "'sweat-equity' contributed by UIH in [Wharf Cable's] nascent beginnings." Id. at 701. Fung authored another memorandum to Ng on September 1 expressing that "a partnership with UIH can be of strategic benefit to Wharf Cable," and reiterating that UIH's contribution "was made in the spirit of entrepreneurial partnership and justifies a form of compensation commensurate with the expected upside of the Wharf Cable project." Id. at 885. Ng approached the Wharf board

12

in early September to discuss UIH's investment in CNCL. On September 9, Ng reported to Fung: "Didn't get very far with the Chairman! More interested in a telecom partner! How do we get out?" Id. at 887.

Schneider and Ng continued to correspond in September and October. According to Schneider, Ng hinted for the first time that a deal might not be forthcoming without a telephone partner. Schneider pressed Ng for completion of the memorandum of understanding and stressed that "[o]ur deal was never to seek compensation but to be a 10-20% investor in the project. This was our agreement from the very beginning." Id. at 888. Ng advised Schneider that "[y]ou were made aware early on that board approval was necessary on our side. You were also made aware at the time NYNEX made the decision at the end of last year, that firstly we would need to find a new basis, and that secondly, my board directed we should focus on station launch." Appellants' App. at 3237-38

Schneider and Fries traveled to Hong Kong for Wharf's station launch on October 31. While there, they explained to Wharf's board chairman UIH's contribution to the cable project and UIH's concomitant right of investment. According to Schneider, the chairman looked surprised. After the meeting, Ng urged Schneider to be patient.

On November 5, 1993, UIH submitted its final draft memorandum of understanding to Wharf, which stated that "UIH's investment in CNCL is

13

conditioned upon the approval of the board of UIH and WCIL."  Appellants'
Addendum at 623.  Schneider also addressed a letter to Ng, stating:  "As you and
I have discussed, UIH has an expectation and desire to invest not less than 10%
in the Wharf Cable project.  This has been our intent from the very beginning and
has been reconfirmed by both of us throughout our relationship."        Id. at 620.

UIH prepared another S-1 statement in early November.  After discussions
between UIH and Wharf concerning language to describe the parties'
relationship, UIH settled on the following:

> [UIH] continues to pursue its opportunity to acquire through UIH
> Asia a 10% interest in Wharf Cable Limited and its affiliated
> programming company. . . .  [UIH] is currently negotiating the
> acquisition of the 10% interest in Wharf Cable . . . .  [UIH]
> anticipates that the terms of this investment will be finalized during
> the first three months of 1994; however, there can be no assurance
> that the Company will   acquire an interest   in Wharf Cable.

Id. at 631.  A December 11 internal Wharf note regarding the S-1 states that the

> proper legal disclaimers have been inserted in the language so as to
> not bind us to UIH's representation which speaks to an
> "opportunity" to acquire a 10% interest in Wharf Cable.  Our next
> move should be to claim that our directors got quite      upset over these
> representations and have therefore instructed us to "settle up" on the
> [technical cooperation agreement] only.  Publicly, we       do not
> acknowledge the opportunity and speak only to UIH's involvement
> vis a vis the [Technical Cooperation Agreement].

Appellees' Suppl. App. at 925 (emphasis in original).  Similarly, in a November
24 document entitled "Bi-Weekly Meeting with Chairman" under the topic
"UIH," the following notations were made:  "start to back pedal" and "Activate

14

TCA [Technical Cooperation Agreement]." Id. at 926.

On December 1, 1993, Ng conveyed to Schneider that the Wharf board was divided over UIH's participation and the matter was "unlikely to be resolved . . . in the near term." Id. at 928. A memo prepared by Ng to the Wharf board indicated that Ng "[e]ncouraged [UIH] to activate" the Technical Cooperation Agreement, "but they were careful not to take the bait." Id. Schneider wrote a letter to Ng stating UIH would be "happy" to accept payment under the Technical Cooperation Agreement provided UIH was not "in any way prejudicing our position that we have been working under the expectation of an investment into Wharf Cable." Id. at 931. Scribbled in the margin of Ng's copy of the letter are the words "be careful, must deflect this! how?" Id. In an internal Wharf document entitled "Agenda for Meeting with Chairman," the word "stall" was written next to the topic "partnership strategy: UIH/others." Id. at 933. After significant pressing, Schneider met with Wharf's board in Hong Kong on March 18, 1994, to describe UIH's involvement in the Wharf cable project. Schneider told the board that UIH would be pleased to have the right to invest and was glad to be partners with Wharf. Approximately two hours after the meeting, Ng informed Schneider that the "board is not ready to entertain your investment at this time." Appellants' App. at 2453.

15

**Instant litigation**

UIH initiated this action in November 1994, asserting it had provided invaluable services that enabled Wharf not only to obtain the cable license, but also to develop and implement the system. UIH contended these services were rendered with the parties' mutual understanding that UIH was entitled to a 10% option to invest in CNCL. According to UIH, Wharf sold the option on October 8 in exchange for UIH's services. UIH alleged Wharf deliberately misled UIH and never intended to honor the option to invest. Based on these facts, UIH asserted twelve claims for relief in its amended complaint, including violation of Section 10(b) of the Securities Exchange Act, violation of the Colorado Securities Act, breach of contract, fraud, breach of fiduciary duty, and negligent misrepresentation. UIH sought both compensatory and punitive damages.

Wharf denied all allegations and asserted UIH was aware from even preliminary negotiations that any deal was contingent on involvement of a telephone partner such as NYNEX. Wharf denied the existence of a joint venture. In addition, Wharf claimed the documentary evidence demonstrated its unequivocal intention not to be bound by anything short of a written agreement. Finally, Wharf contended any deal was subject to approval by each party's board of directors.

**Subject matter jurisdiction**

On appeal, Wharf contends UIH has not stated an actionable federal claim and, as a result, we must dismiss not only the Rule 10b-5 claim but also the state claims. We consider this jurisdictional issue de novo. See Brumark Corp. v. Samson Resources Corp., 57 F.3d 941, 944 (10th Cir. 1995).

In its complaint, UIH alleged subject matter jurisdiction existed by virtue of a federal question, namely securities fraud in violation of section 10(b) of the Securities Exchange Act and Securities Exchange Commission Rule 10b-5. See 28 U.S.C. § 1331. UIH pleaded supplemental jurisdiction existed over the state law claims pursuant to 28 U.S.C. § 1367(a). Implicit in Wharf's argument is the notion that dismissal of a federal claim either in the district court or on appeal automatically compels dismissal of pendent state claims. This clearly is not our rule. We recognize that a federal court must have constitutional power to exercise pendent jurisdiction. The scope of a federal court's jurisdictional power, however, does not fluctuate with the fate of a federal claim at trial or on appeal, but exists if the federal claim initially had "substance sufficient to confer subject matter jurisdiction on the court." Jones v. Intermountain Power Project, 794 F.2d 546, 549 (10th Cir. 1987), overruled on other grounds, Yellow Freight Sys., Inc. v. Donnelly, 494 U.S. 820 (1990). A federal claim is insubstantial, and

17

incapable of conferring jurisdiction, "only if it is 'obviously without merit or is wholly frivolous,' or 'is clearly foreclosed by prior decisions of the Supreme Court.'" Plott v. Griffiths, 938 F.2d 164, 167 (10th Cir. 1991). Once federal question jurisdiction exists, it is within the trial court's discretion to exercise supplemental jurisdiction over those state law claims that derive from a common nucleus of facts. See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1477 (10th Cir. 1990). Thus, a district court has the constitutional power to exercise supplemental jurisdiction over state claims even after a federal claim has been dismissed, provided the federal claim was not insubstantial from the outset. See 13B Charles A. Wright et al., Federal Practice and Procedure, § 3564 (1984), at 74 ("The practical importance of the distinction between [dismissal for failure to state a claim and dismissal for bringing an insubstantial claim] is that if the federal claim is substantial enough to invoke federal jurisdiction, the court has power to exercise pendent jurisdiction over other claims that also may be asserted in the complaint, for which there is no independent jurisdictional basis."). The same rule applies on appeal: "Once a trial is held . . . this court will order dismissal of a pendent claim on remand only when the federal cause of action was so insubstantial and devoid of merit that there was no federal jurisdiction to hear it." Jones, 794 F.2d at 549 (citations omitted). Therefore, we will uphold the district court's exercise of jurisdiction if the allegations in UIH's complaint

18

state a substantial and nonfrivolous 10b-5 claim.

Section 10(b) of the Securities Exchange Act, codified at 15 U.S.C. § 78j, declared it

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
> . . .
> (b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.

In accordance with section 10(b), the Commission prescribed 17 C.F.R. § 240.10b-5 (Rule 10b-5), which renders it unlawful for any person, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

To state an actionable 10b-5 claim, a plaintiff must allege (1) the defendant made an untrue statement of material fact or failed to state a material fact; (2) the defendant made the misrepresentation in connection with the purchase or sale of a security; (3) the defendant made the misrepresentation with scienter; and (4) the plaintiff relied on the misrepresentation and sustained damages as a proximate result of the misrepresentation. *See* Anixter v. Home-Stake Prod. Co., 77 F.3d

19

1215, 1225 (10th Cir. 1996).

In resolving Wharf's jurisdictional challenge, our task is to review UIH's complaint, identify the alleged security, ascertain whether it allegedly was purchased or sold as defined under the Securities Exchange Act, and determine if Wharf's alleged misrepresentations were made in connection with the purchase or sale of a security. After conducting this review, we are convinced that UIH's allegations not only are substantial and nonfrivolous, but state an actionable 10b-5 claim sufficient to withstand a motion to dismiss.

UIH has asserted throughout this case, without challenge from Wharf, that the security for 10b-5 purposes is not the CNCL stock but is the option itself ("The grant of the option to acquire at least 10% of the stock of CNCL was the sale of a security to [UIH], within the meaning of the Securities Exchange Act." Appellants' App. at 90.). Wharf does not contest on appeal the classification of the option as a security. Therefore, we assume the option is a security for purposes of our review. See One-O-One Enterprises, Inc. v. Caruso, 848 F.2d 1283, 1288 (D.C. Cir. 1988). UIH also alleges that the option was purchased by UIH on October 8, 1992, in exchange for its continued and expanded assistance to Wharf in the pursuit of the cable television bid. Thus, UIH was a purchaser of a security within the scope of the Exchange Act. Finally, UIH alleges that Wharf made material misrepresentations and omissions regarding the option. See

20

_Superintendent of Ins. v. Bankers Life & Cas. Co._, 404 U.S. 6, 12 (1971) (concluding the "in connection with" requirement is satisfied if plaintiff has "suffered an injury as a result of deceptive practices touching" the purchase or sale of a security). Wharf's representations allegedly were false when made and were made either with knowledge of their falsity or with reckless disregard for their truth or falsity. The representations allegedly were made to induce UIH to purchase the option. As such, the misrepresentations were made to influence UIH's investment decision and were made in connection with the purchase or sale of a security. _See_ _SEC v. Jakubowski_, 150 F.3d 675, 679 (7th Cir. 1998); _Angelastro v. Prudential-Bache Secs., Inc._, 764 F.2d 939, 943 (3d Cir. 1985).

Wharf describes UIH's 10b-5 claim as involving a mere allegation that Wharf misrepresented its intent to sell UIH securities or a simple dispute between Wharf and UIH over its rights to purchase stock. Wharf claims such disputes are outside the scope of the federal securities laws. Wharf relies heavily on _Blue Chip Stamps v. Manor Drug Stores_, 421 U.S. 723 (1975). In _Blue Chip Stamps_, the Court held that only actual purchasers or sellers of securities, or those designated by the Securities Exchange Act as purchasers or sellers, have standing to bring a private cause of action for a 10b-5 violation. _Id._ at 749. Here, UIH was an actual purchaser of a security as it purchased the option from Wharf on October 8, 1992. _Blue Chip_ does not preclude UIH's 10(b)(5) claim. _See id._ at

21

751 ("the holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities have been recognized as 'purchasers' or 'sellers' of securities for purposes of Rule 10b-5, not because of a judicial conclusion that they were similarly situated to 'purchasers' or 'sellers,' but because the definitional provisions of the 1934 Act themselves grant them such a status").

Further, we disagree with Wharf's assertion that misrepresentations regarding intent to sell securities or disputes over a right to purchase stock necessarily are outside the scope of Rule 10b-5. Courts have noted that fraud in the purchase or sale of a security includes entering into a contract to sell a security with a secret reservation not to fully perform the contract. See In re Phillips Petroleum Secs. Litig., 881 F.2d 1236, 1245 n.13 (3d Cir. 1989); Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986); Threadgill v. Black, 730 F.2d 810, 811-12 (D.C. Cir. 1984); Richardson v. MacArthur, 451 F.2d 35, 40 (10th Cir. 1971). It is a party's secret reservation not to fully perform a securities contract that distinguishes these cases from routine breach of contract and common law fraud cases and brings them within the scope of Rule 10b-5. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993).

We conclude the other cases cited by Wharf are distinguishable or inapposite. Two of the three cases involved breaches of contract and not misrepresentations regarding an option or other security. Hunt v. Robinson, 852

22

F.2d 786, 787 (4th Cir. 1988) (noting the plaintiff had "alleged no misrepresentation of the value of the stock which was to be conveyed"); Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 194 (3d Cir. 1976) (noting the plaintiff did allege fraud, but not just in connection with the sale that actually occurred). In the third case cited by Wharf, Gurwara v. LyphoMed, Inc., 937 F.2d 380 (7th Cir. 1991), the defendant misrepresented to plaintiff, its employee, that plaintiff's option to buy defendant's stock would be unaffected by his termination for disability. When plaintiff attempted to exercise his option after accepting a disability assignment, however, defendant cited his disability status and did not allow his purchase of the stock. Plaintiff sued under Rule 10b-5 for securities fraud. Unlike here, the plaintiff in Gurwara alleged that the security was the stock to be purchased and not the option to purchase the stock. Therefore, defendant's misrepresentations were not related to the stock but to the option, which was neither alleged nor assumed to be a separate security. The court dismissed the claim because defendant's misrepresentations related not to the value of the stock that plaintiff sought to purchase, but to the value of the option. In doing so, the court stated: "Whether [plaintiff] might have sued successfully under section 10(b) for misrepresentations in connection with his option contract is an issue we need not resolve. Throughout the lawsuit, [plaintiff] has clearly relied on the LyphoMed stock itself as the 'security' on which his 10(b) action

23

was based." Id. at 382 n.2. Viewed in this light, Gurwara is entirely inapplicable to UIH's claim. [1]

In summary, if a party alleges a substantial and nonfrivolous federal claim, a district court obtains subject matter jurisdiction and may, in its discretion, exercise supplemental jurisdiction over related state law claims. Once subject matter jurisdiction exists, a district court has constitutional authority to hear related state claims even if the federal claim is later dismissed by the district court or by this court on appeal. Here, UIH's 10b-5 allegations clearly are not frivolous, and in fact are sufficient to state a claim under Rule 10b-5.

**Applicability of Hong Kong law**

---

[1] Moreover, in SEC v. Jakubowski, 150 F.3d at 679, the court retreated from Gurwara:

> Gurwara was foreordained by Blue Chip Stamps, which held that a misrepresentation that induces a decision not to purchase securities is outside the scope of § 10(b) and Rule 10b-5. . . . In both Blue Chip Stamps and Gurwara stock had a bargain element that eluded a potential purchaser because of a deceit, which fell outside Rule 10b-5 because there was no sale. . . . True enough, we wrote in Gurwara that the "misrepresentation went only to Gurwara's opportunity to purchase the stock at the described price. It in no way related to the value of that stock." . . . But this passage was irrelevant to the question whether the statements were "in connection with" a (nonexistent) purchase or sale. Dicta cannot control over the language of the statute.

24

Wharf argues that the relationship between Wharf and UIH was governed by Hong Kong law, that the application of Hong Kong law precludes application of the federal securities laws, and that nonapplicability of the federal securities laws prevents the exercise of federal jurisdiction.

We disagree with the premise underlying this argument – that forum selection or choice of law issues implicate a court's subject matter jurisdiction. Forum selection issues raise concerns not of subject matter jurisdiction but of improper venue or failure to state a claim on which relief may be granted. See Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1289-90 (11th Cir. 1998), cert. denied, 119 S. Ct. 851 (1999); New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG, 121 F.3d 24, 28 (2d Cir. 1997); Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 956 (10th Cir. 1992). Choice of law issues are equally unrelated to subject matter jurisdiction; state and federal courts routinely apply the law of other states, even of other countries. See Vukadinovich v. McCarthy, 59 F.3d 58, 62 (7th Cir. 1995); Rivendell Forest Prods., Ltd. v. Canadian Pac. Ltd., 2 F.3d 990, 994 (10th Cir. 1993). Although a district court applying foreign law might find it appropriate to exercise its discretion and either transfer venue or dismiss a case on grounds of forum nonconveniens, the court here denied Wharf's motion to dismiss for forum nonconveniens, a ruling that Wharf does not separately appeal.

25

Wharf has not presented any choice of law issue with respect to UIH's Rule 10b-5 claim. It is sufficient that the anti-fraud provisions of the Securities Exchange Act reach Wharf's conduct. These provisions prohibit fraud in the sale of securities when significant conduct occurs in the United States or conduct occurs anywhere and has substantial effects on investors in the United States. See Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 993 (2d Cir. 1975); Restatement (Third) of Foreign Relations Law of the United States § 416 (1987). Here, the crux of UIH's 10b-5 claim is the October 8, 1992, meeting between Wharf and UIH in Denver, Colorado. The security was sold at that meeting, the negotiations for the sale occurred at that meeting, and the most material of Wharf's misrepresentations were made at that meeting. Since conduct material to the completion of the fraud occurred in the United States, jurisdiction is appropriate despite the fact that additional relevant conduct occurred abroad. See Alfadda v. Fenn, 935 F.2d 475, 478-79 (2d Cir. 1991); Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1045-46 (2d Cir. 1983).

Wharf has not identified any international comity or international choice of law issues that would reasonably compel a court to decline to exercise its jurisdiction in these circumstances. In general, we will not consider an international comity or choice of law issue unless there is a "true conflict" between United States law and the relevant foreign law. Hartford Fire Ins. Co. v.

26

California, 509 U.S. 764, 798-99 (1993); In re Maxwell Communication Corp., 93 F.3d 1036, 1049-50 (2d Cir. 1996). A true conflict exists only when a person subject to regulation by two states cannot comply with the laws of both. Hartford Fire, 509 U.S. at 799; Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998); Metro Indus., Inc. v. Sammi Corp., 82 F.3d 839, 847 n.5 (9th Cir. 1996). A true conflict would exist here only if Hong Kong law *compelled* securities fraud rather than just permitted it.

Wharf has presented scant evidence either that Hong Kong is the appropriate forum or that Hong Kong law applies to the dispute at issue. Wharf reasons that from language in unsigned documents which states that Hong Kong law applies and that the parties would submit to the non-exclusive jurisdiction of the Hong Kong courts, we can infer the parties intended that any forum selection and choice of law provisions be given effect. We disagree. These documents at best represent the parties' intent. The documents are virtually irrelevant in their unsigned form and are insufficient to constitute binding forum selection and choice of law provisions. "To be mandatory, a clause must contain language that clearly designates a forum as the exclusive one." Northern California Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co., 69 F.3d 1034, 1037 (9th Cir. 1995).

Wharf cites Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974), and Riley,

27

969 F.2d 953. Neither case is contrary to the result we reach here. Both cases involved unambiguous forum selection clauses and choice of law provisions in signed, bargained-for contracts. Wharf also cites provisions of Restatement (Second) of Conflict of Laws which direct that if parties have not specified the law to be applied, the law of the jurisdiction with the most significant relationship to the incident is adopted. Again, however, Wharf does not direct our attention to specific Hong Kong law that conflicts with the law of the forum. Contrary to Wharf's assertions, courts routinely decline to consider choice of law issues in the absence of a demonstrated conflict. See In re Payless Cashways, 203 F.3d 1081, 1084 (8th Cir. 2000); Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 29 (1st Cir. 1997); Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S., 10 F.3d 1015, 1018 (3d Cir. 1993); Barron v. Ford Motor Co., 965 F.2d 195, 197 (7th Cir. 1992).

**Statute of Frauds**

Wharf asserts the district court erred in refusing to instruct the jury on the statute of frauds. The court ruled that the option did not fit neatly within the definition of "security" under C.R.S. § 4-8-319, and that several exceptions took the option agreement outside the scope of the statute of frauds. We review de novo a determination that the statute of frauds does not apply. See Horace Mann

28

Ins. Co. v. Johnson, 953 F.2d 575, 576 (10th Cir. 1991) (reviewing district court's interpretation and application of state law de novo).

Wharf argues that UIH's oral option is barred by two Colorado statute of frauds provisions. First, Wharf urges us to apply C.R.S. § 4-8-319, the statute of frauds applicable to "a contract for the sale of securities." Second, Wharf seeks application of C.R.S. § 38-10-112(a), the statute of frauds for agreements that by their terms may not be performed within a year of their making. Wharf has waived its argument with respect to § 38-10-112(a) by failing to raise it in district court.

Section 4-8-319 provides that a contract for the sale of securities is not enforceable by way of action or defense unless (1) there is some writing signed by the party against whom enforcement is sought sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; (2) delivery of a certificated security or transfer instruction has been accepted, or transfer of an uncertificated security has been registered and the transferee has not timely sent a written objection; (3) there is a confirming writing; or (4) the party against whom enforcement is sought admits the contract in a pleading, testimony or court. [2]

_____

[2] Section 4-8-319 was repealed in 1996. Under current Colorado law, a "contract or modification of a contract for the sale or purchase of a security is

(continued...)

Initially, we must identify what constitutes the alleged "security" for purposes of our analysis. Wharf asserts the security is CNCL stock. UIH asserts the option itself is the instrument that should be analyzed to determine if it is a "security." The October 8, 1992, contract was for the purchase of the option. UIH traded its services to Wharf and in turn received an option to purchase CNCL securities.

We next consider if the option is in fact a "security" for purposes of § 4-8-319. The definition of "security" under § 4-8-319 bears little resemblance to the definition of "security" under federal securities laws. Section 4-8-102 classifies securities as either certificated or uncertificated. A certificated security is a share, participation, or other interest in property or an enterprise of the issuer or an obligation of the issuer which is

>   (I) Represented by an instrument issued in bearer or registered form;
>   (II) Of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and
>
>   (III) Either one of a class or series or by its terms divisible into a class or series of shares, participations, interests, or obligations.

---

[2](...continued)
enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making." C.R.S. § 4-8-113.

C.R.S. § 4-8-102(1)(b). An uncertificated security is a share, participation, or other interest in property or an enterprise of the issuer or an obligation of the issuer which is

> (I) Not represented by an instrument and the transfer of which is registered upon books maintained for that purpose by or on behalf of the issuer; and
> (II) Of a type commonly dealt in on securities exchanges or markets; and
> (III) Either one of a class or series or by its terms divisible into a class or series of shares, participations, interests, or obligations; and
> (IV) Not a partnership interest in a limited partnership.

C.R.S. § 4-8-102(c).

Wharf has not explained, and we cannot discern, how UIH's option fits within either definition. We agree with the district court that UIH's oral option was not a security under § 4-8-102(1), but was a security under the federal Securities Exchange Act. See Comment to § 4-8-102 ("This definition has no bearing upon whether an interest is a 'security' for purposes of federal securities laws. By the same token the definitions of 'securities' for purposes of those laws has no bearing upon whether an interest is a security within the definition of this Article."). Because Wharf did not establish that the option was a security under 4-8-319, it was not entitled to rely on the statute of frauds.

The district court ruled that "several equitable exceptions" to the statute of frauds applied. Although the court mentioned in its order the fraud, promissory

31

estoppel, and full performance exceptions, it primarily discussed the partial performance exception. We agree that, even if UIH's option is a security for purposes of § 4-8-319, the partial performance exception precludes application of the statute of frauds. "[T]he part performance doctrine operates to preclude the application" of the statute of frauds. Nelson v. Elway, 908 P.2d 102, 108 (Colo. 1995). The doctrine applies if there is partial performance of an oral contract which is "(1) substantial; and (2) required by, and fairly referable to no other theory besides that allegedly contained within the oral agreement." Id. "This rule is based on the premise that the conduct constituting that partial performance must convincingly evidence the existence of the oral agreement." Id.

The alleged oral agreement between UIH and Wharf required UIH to provide additional services to Wharf. It cannot be disputed that UIH substantially, and most likely fully, satisfied its obligations. Indeed, Wharf does not dispute the assistance rendered by UIH, but asserts the assistance was fairly referable to Wharf's theory that UIH performed services relating to the cable television project in the hope of persuading Wharf to sell it 10% of CNCL stock. Because the issue of partial performance presents factual questions, see A & R Co. v. Union Air Transport, Inc., 738 P.2d 73, 74-75 (Colo. App. 1987), Wharf contends the district court improperly took this issue from the jury and exacerbated its error by failing to instruct on partial performance.

32

We conclude the district court did not take the issue of partial performance from the jury, nor did it err in instructing the jury. We review the district court's refusal to give a particular instruction for an abuse of discretion. As for the instructions, we conduct a de novo review to determine whether as a whole they correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards. Allen v. Minnstar, Inc., 97 F.3d 1365, 1368 (10th Cir. 1996).

We agree with the district court that Wharf's proposed instruction on partial performance was superfluous. The breach of contract instruction on consideration precluded recovery on breach of contract if the jury found that UIH "in exchange for the option . . . did or promised to do nothing more than it was already obligated to do, or was working voluntarily for its own benefit." Appellees' Suppl. App. at 81. Because the jury found that consideration existed and the oral option agreement was valid, it necessarily concluded that UIH provided Wharf assistance in exchange for the option and not for an extraneous reason or in accordance with a separate "fairly referable" theory proffered by Wharf. See Ellis Canning Co. v. Bernstein, 348 F. Supp. 1212, 1229 (D. Colo. 1972).

We concede that a district court may properly give a separate instruction on partial performance if it is warranted by the evidence. In reviewing a claim of

33

instructional error, however, we consider the instructions in their totality and determine not whether they were faultless in every particular, but whether the jury was misinformed or misled. Resolution Trust Corp. v. Stone , 998 F.2d 1534, 1549 (10th Cir. 1993). We can discern no prejudice to Wharf based on the district court's failure to separately instruct the jury as to partial performance.

**Economic Loss Rule**

Wharf argues that UIH's fraud, breach of fiduciary duty, and negligent misrepresentation claims are barred by the economic loss rule. The economic loss rule is designed to preclude plaintiffs from circumventing the law of contract and seeking recovery in tort for what in essence is merely a claim of damages for breach of contract. As applied in Colorado, the rule "prevents recovery for negligence when the duty breached is a contractual duty and the harm incurred is the result of failure of the purpose of the contract." Jardel Enterprises, Inc. v. Triconsultants, Inc. , 770 P.2d 1301, 1303 (Colo. App. 1988). Wharf asserts the economic loss rule is triggered here because UIH's tort claims do not allege tortious conduct independent of Wharf's breach of contract, but rest solely on UIH's allegation that Wharf did not honor its option agreement. We review de novo the district court's rejection of Wharf's contentions. See Horace Mann , 953 F.2d at 576.

34

Wharf's argument that the economic loss rule precludes UIH's fraud and breach of fiduciary duty claims is without merit. It is settled in Colorado that the economic loss rule applies only to tort claims based on negligence, and only to *some* negligence claims. "As a general rule, no cause of action lies in tort when purely economic damage is caused by negligent breach of a contractual duty." Jardel, 770 P.2d at 1303. The Colorado Court of Appeals distinguished the situation in Jardel, which involved a breach of contract and negligence claim, from cases in which an intentional tort was alleged. Id. at 1304. Since Jardel, Colorado courts and courts applying Colorado law have noted this distinction and applied the economic rule accordingly. See Town of Alma v. Azco Constr., Inc., 985 P.2d 56 (Colo. App. 1999) Terrones v. Tapia, 967 P.2d 216, 220 (Colo. App. 1998); Commercial Union Ins. Co. v. Roxborough Village Joint Venture, 944 F. Supp. 827, 832 (D. Colo. 1996); Cook v. Rockwell Int'l Corp., 778 F. Supp. 512, 516 (D. Colo. 1991). The Colorado Court of Appeals implicitly reinforced this interpretation of the economic loss rule in Grynberg v. Agri Tech, Inc., 985 P.2d 59 (Colo. App. 1999), where it prohibited plaintiffs from maintaining a negligence claim based on an alleged breach of a duty that arose only from the parties' contract. Without comment, the court allowed plaintiffs' breach of fiduciary duty claim to stand.

In characterizing UIH's fraud and breach of fiduciary duty claims as

factually synonymous with UIH's breach of contract claim, Wharf assumes the economic loss rule bars all claims related to a contractual transaction except breach of contract claims. This assumption is erroneous. The economic loss rule precludes recovery in tort only when "the duty breached is a contractual duty." Jardel, 770 P.2d at 1303. The rule is inapplicable where "the duty breached . . . arises independent of the contract." Id. at 1304. Here, UIH's breach of fiduciary duty claim arose not from the contract but from the parties' status as joint venturers. See McCrea & Co. Auctioneers, Inc. v. Dwyer Auto Body, 799 P.2d 394, 398 (Colo. App. 1989). UIH's fraud claim, although premised on representations made in the course of contractual negotiations, likewise arose independently of the contract. In Brody v. Bock, 897 P.2d 769, 776 (Colo. 1995), the Colorado Supreme Court rejected the trial court's ruling that representations that formed the basis for a common law fraud claim could not also form the substance of an alleged oral contract.

The rationale underlying the economic loss rule also explains why the rule does not preclude UIH's negligent misrepresentation claim. Where a negligence claim is based only on breach of a contractual duty, the law of contract rightly does not punish the breaching party, but limits the breaching party's liability to damages that naturally flow from the breach. It is an altogether different situation where it *appears* two parties have in good faith entered into a contract

36

but, in actuality, one party has deliberately made material false representations of past or present fact, has intentionally failed to disclose a material past or present fact, or has negligently given false information with knowledge that the other party would act in reliance on that information in a business transaction with a third party. The breaching party in this latter situation also is a tortfeasor and may not utilize the law of contract to shield liability in tort for the party's deliberate or negligent misrepresentations.

Colorado has recognized that "a claim of negligent misrepresentation based on principles of tort law, independent of any principle of contract law, may be available to a party to a contract." Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, 892 P.2d 230, 235-36 (Colo. 1995). A negligent misrepresentation claim is based not on a contractual duty but on an independent common law duty requiring a party, in the course of business, to exercise reasonable care or competence in obtaining or communicating information on which other parties may justifiably rely. Id. at 236. Consequently, the economic loss rule does not bar UIH's negligent misrepresentation claim.

**Sufficiency of evidence regarding oral option contract**

Wharf contends the evidence introduced at trial was insufficient to support

a finding that UIH had acquired an option to invest. Wharf asserts the documentary evidence – the draft letters of intent, memoranda of understanding, and shareholders' agreements – is flatly inconsistent with the concept of an oral option. "When a jury verdict is challenged on appeal, our review is limited to determining whether the record – viewed in the light most favorable to the prevailing party – contains substantial evidence to support the jury's decision." Thunder Basin Coal Co. v. Southwestern Pub. Serv. Co., 104 F.3d 1205 (10th Cir. 1997). The jury has the "exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact." Id.

We conclude there is ample evidence in the record to support the jury's finding that UIH obtained an option on October 8, 1992. UIH officials testified that Ng specifically granted such an option in exchange for UIH's continued and expanded provision of services to Wharf. UIH partially or fully performed its obligations under the alleged option agreement. Internal Wharf documents, while not explicitly conceding that UIH had a 10% option to invest in CNCL, expressly discussed steps that Wharf should take to "get out" of the agreement and contemplated stalling and back pedaling. Viewed in light of the totality of the evidence presented at trial, the proposed unsigned documents heralded by Wharf

38

do nothing more than create factual conflicts and raise questions of witness credibility. See Mohler v. Park County Sch. Dist. RE-2, 515 P.2d 112, 114 (Colo. App. 1973). The jury resolved these conflicts in favor of UIH by specifically finding in the special verdict form that UIH and Wharf did not intend to be bound only by a written contract and that UIH would not have known that Wharf intended to be bound only by a written contract. See Appellants' App. at 1569. We will not disturb the jury's resolution of these issues where, as here, there is substantial evidence in the record to support the jury's verdict.

**Damages**

The jury awarded $67,000,000 in compensatory damages on the securities fraud claims, common law fraud claim, breach of contract claim, and breach of fiduciary duty claim, and $58,500,000 in punitive damages on the common law fraud claim and breach of fiduciary duty claim. Judgment was entered by the district court for $125,000,000 because UIH indisputably is limited to a single recovery for its loss. Wharf argues the compensatory damages award was not supported by the evidence, was speculative and facially excessive, and did not account for UIH's obligation to mitigate its damages. Wharf asserts the punitive damages award was not supported by the evidence and was contrary both to Colorado and federal law.

Compensatory damages

Wharf contends that the evidence introduced at trial was insufficient to sustain the $67,000,000 award. Specifically, Wharf argues that UIH damage expert Robert Jones grossly overstated the value of UIH's alleged option by failing to "deduct the price . . . UIH had to pay to exercise the option – a price guesstimated at $50,000,000 or more." Appellants' Br. at 40. In other words, Wharf argues Jones estimated the value of a 10% stock interest in CNCL without considering the corresponding 10% capital funding contribution UIH was required to make to exercise the option.

Initially, we must determine whether Wharf preserved this issue for review. To preserve a sufficiency of the evidence claim for appellate review, a party must move for judgment as a matter of law (directed verdict) under Federal Rule of Civil Procedure 50(a) at the close of the evidence. See FDIC v. United Pacific Ins. Co., 20 F.3d 1070, 1076 (D.C. Cir. 1994). Motions under Rule 50 must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed. R. Civ. P. 50(a)(2). A party may not circumvent Rule 50(a) by raising for the first time in a post-trial motion issues not raised in an earlier motion for directed verdict. See FDIC, 20 F.3d at 1076.

Wharf asserts it raised this specific damage issue in its motion for directed verdict at the close of evidence and reasserted the issue in its post-trial motions.

40

Clearly, Wharf presented the issue in its post-trial motions. See Appellants' App. at 1602 ("The Court should enter judgment for defendants or order a new trial because the jury's award is not supported by legally sufficient evidence. It is based on the asserted value of a 10% interest in the Wharf cable project, rather than the value of plaintiffs' alleged 'option' to obtain such an interest, which is legally, economically and factually different.").

Wharf's motion for directed verdict at the close of evidence was made orally. It comprised ten transcribed pages in the trial record and covered a multitude of subjects. However, not once did Wharf mention damages. Id. at 10023-10033. Wharf argues the damage issue was included by implication in the other issues raised in the motion for directed verdict and thereby preserved for both post-trial and appeal purposes. In considering whether the grounds of a motion for directed verdict were stated with sufficient specificity, we liberally construe Rule 50 in light of its purpose "to secure a just, speedy, and inexpensive determination of a case." Anderson v. United Tel. Co., 933 F.2d 1500, 1503 (10th Cir. 1991). Technical precision is unnecessary. A rigid application of the rule is in order only if such application serves either of the rule's rationales – protecting the right to trial by jury or ensuring an opposing party has sufficient notice of an alleged error so that it may be cured before the party rests its case. Id. We consider whether the grounds stated in the motion are sufficiently

41

specific on a case-by-case basis.    See id. at 1504.

Wharf has not satisfied the "specific grounds" requirement no matter how liberally we construe it.  While Rule 50 "does not require technical precision in stating the grounds of the motion[,] [it] does require that they be stated with sufficient certainty to apprise the court and opposing counsel of the movant's position with respect to the motion."  9A Charles A. Wright & Kenneth A. Graham, Jr., Federal Practice and Procedure § 2533 (1995), 310.  "The statement of one ground precludes a party from claiming later that the motion should have been granted on a different ground."    Id.

In Green Constr. Co. v. Kansas Power & Light Co. , 1 F.3d 1005, 1012-13 (10th Cir. 1993), we refused to entertain on appeal a defendant's sufficiency of the evidence argument regarding the plaintiff's breach of contract, retainage, and alter ego claims where in its directed verdict motion the defendant raised sufficiency only with respect to plaintiff's misrepresentation claim.  In    FDIC, we rebuffed a defendant's attempt to raise sufficiency questions regarding proof of bond coverage because the defendant moved for directed verdict only on the ground that the plaintiff's claim "was based on speculation and conjecture."  20 F.3d at 1075.  See also Kientzy v. McDonnell Douglas Corp. , 990 F.2d 1051, 1060 (8th Cir. 1993); House of Koscot Dev. Corp. v. American Line Cosmetics, Inc., 468 F.2d 64, 67-68 (5th Cir. 1972).  As these cases demonstrate, merely

42

moving for directed verdict is not sufficient to preserve any and all issues that could have been, but were not raised in the directed verdict motion.   See First Sec. Bank v. Taylor , 964 F.2d 1053, 1056-57 (10th Cir. 1992).

Since Wharf did not submit this issue to the district court until its post-trial motion for judgment as a matter of law, we may review its argument only to determine if there is *any* evidence to support the damage award.   United States v. Flintco, Inc. , 143 F.3d 955, 967 (5th Cir. 1998);   House of Koscot , 468 F.2d at 68 n.5. Jones' testimony was more than sufficient to satisfy this standard. Jones was an experienced financial analyst with particular expertise in business valuation of cable television systems. He described in detail the basis and methods used to value UIH's loss and explained the rationale underlying his conclusions. His calculations represented a determination of the net present value that UIH's 10% investment in CNCL would have yielded had UIH contributed its 10% funding contribution. Jones' testimony indicated that in determining CNCL's net present value, he considered not only CNCL's projected revenue stream, but also its operating expenses and, significantly, 100% of the projected capital/equity necessary to fund CNCL. This 100% by definition included UIH's 10% capital contribution requirement even if not precisely labeled as such in Jones' analysis. Jones discounted his net calculation to present value and multiplied by 10% to obtain the net value of UIH's 10% interest.

Thus, the evidence introduced at trial supported the jury's $67,000,000 compensatory damage award. See Hudson v. Smith, 618 F.2d 642, 646 (10th Cir. 1980).

Wharf contends the jury's compensatory damage award was grossly excessive and based on sheer speculation. The district court's denial of Wharf's motion for new trial or remittitur on grounds of excessiveness will not be disturbed on appeal absent a gross abuse of discretion. See Campbell v. Bartlett, 975 F.2d 1569, 1577 (10th Cir. 1992). We will not disturb a jury's award of damages on a claim of excessiveness unless the award is so unreasonable as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial. Sanjuan v. IBP, Inc., 160 F.3d 1291, 1300 (10th Cir. 1998). It is within the virtually exclusive purview of the jury to evaluate credibility and fix damages. See Bennett v. Longacre, 774 F.2d 1024, 1028 (10th Cir. 1985).

Wharf's excessive claim is without merit. Jones' testimony and the projections on which it was based provided a sufficiently precise basis for the jury's damage award. None of UIH's claims required measurement of damages by out-of-pocket expenses. UIH instead was entitled to compensation for the loss suffered by Wharf's wrongful deprivation of 10% of CNCL. Jones' testimony establishes this amount as $67,000,000. The jury's adoption of the amount

44

established by Jones indicates it was swayed by his testimony, not by passion, prejudice, or other improper cause.

Wharf also asserts the award is improperly based on speculative income stream projections. Contrary to Wharf's contentions, however, new businesses are not precluded from seeking damages. Rather, damages are precluded only where there is mere anticipation that an entity will enter the marketplace or where the damages are themselves not reasonably determinable. Roberts v. Holland & Hart, 857 F.2d 492, 497 (Colo. App. 1993). As with all claims, a damage award is permissible here if supported by "substantial evidence, which together with reasonable inferences to be drawn therefrom provides a reasonable basis for computation of the damage." Pomeranz v. McDonald's Corp., 843 P.2d 1378, 1383 (Colo. 1993). Jones' testimony and the projections on which it was based provide a sufficiently precise basis for the jury's damage award. See Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1330-31 (10th Cir. 1996); Rainbow Travel Serv. v. Hilton Hotels Corp., 896 F.2d 1233, 1238-39 (10th Cir. 1990).

Wharf challenges the district court's refusal to admit evidence of CNCL's post-1994 actual performance and UIH's purported failure to mitigate damages. We review a district court's exclusion of evidence for an abuse of discretion. See Orjias v. Stevenson, 31 F.3d 995, 999 (10th Cir. 1994). We will not disturb

45

the district court's ruling absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment. See Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 727 (10th Cir. 1993).

At trial, Wharf sought to demonstrate that the cable project's actual performance was worse than forecasted by Jones and that Jones improperly assessed the risks associated with the project. The district court excluded the evidence as irrelevant because damages became fixed on the date Wharf finally denied UIH's option claim – March 18, 1994. See Southern Colo. MRI, Ltd. v. Med-Alliance, Inc., 166 F.3d 1094, 1100 (10th Cir. 1999) ("Breach of contract damages are generally measured at the time of breach."). The court did not abuse its discretion in excluding this evidence.

As regards Wharf's contention that UIH failed to mitigate its damages, Wharf argued that UIH could have invested elsewhere the funds intended for investment in the cable project and that UIH's failure to do so required reduction of any compensatory damage award. An injured party claiming breach of contract generally has a "duty to take such steps as are reasonable under the circumstances in order to mitigate or minimize the damages sustained." Fair v. Red Lion Inn, 943 P.2d 431, 437 (Colo. 1997). A defendant bears the burden of proving the affirmative defense of failure to mitigate. "However, the defense of

46

failure to mitigate damages will not be presented to the jury unless the trial court determines there is sufficient evidence to support it." Id. In its offer of proof made before trial, Wharf did not present any evidentiary support that UIH failed to mitigate its damages. Nor did it direct the court's attention to any evidence that UIH had a substitute investment opportunity. Further, production of such evidence would not have compelled admission of mitigation of damages evidence and the giving of a mitigation of damages instruction unless Wharf also offered evidence that UIH could not have accepted both the additional investment opportunity and the CNCL investment. See Katz Communications, Inc. v. Evening News Ass'n, 705 F.2d 20, 26 (2d Cir. 1983); Restatement (Second) of Contracts § 347, comment f ("If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract."). The district court did not abuse its discretion in excluding Wharf's purported evidence of UIH's failure to mitigate damages.

## Punitive damages

Wharf contends the evidence is insufficient to sustain the punitive damages award. Wharf argues the evidence at best indicates it "did not promptly advise UIH of its intention not to proceed with the transaction under negotiation."

Appellants' Br. at 47. Wharf described UIH's injury as the loss of a contractual opportunity.

Colorado permits the imposition of punitive damages in "all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." C.R.S. § 13-21-102(1)(a). Willful and wanton conduct is "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." C.R.S. § 13-21-102(b). The amount of punitive damages must be reasonable, and generally cannot exceed the amount of a compensatory damages award. C.R.S. § 13-21-102(a). A party must prove entitlement to punitive damages beyond a reasonable doubt. C.R.S. § 13-25-127(2). Whether the evidence is sufficient to support a punitive damages award is a question of law we review de novo. Miller v. Byrne, 916 P.2d 566, 580 (Colo. App. 1996). We consider the evidence in its totality and "in the light most supportive of the verdict." Life Care Ctrs. of America, Inc. v. East Hampden Assocs. Ltd. Partnership, 903 P.2d 1180, 1188 (Colo. App. 1995).

There was ample evidence to support the jury award. The jury necessarily found that on October 8, 1992, Ng agreed to grant UIH a 10% option, knowing

48

even then that Wharf would not allow UIH to exercise that option. Wharf's internal memos in particular not only evidence Wharf's deliberate misrepresentations regarding the existence of UIH's option, but also reveal Wharf's internal generation of fabricated excuses and purposeful implementation of stall tactics in its subsequent dealings with UIH. Wharf points out that UIH's depiction of events was contradicted by other credible evidence. "The presence of conflicting testimony need not prevent a jury from deciding that one side has proven the existence of facts beyond a reasonable doubt." Klein v. Grynberg, 44 F.3d 1497, 1504 (10th Cir. 1995). Wharf had its opportunity at trial to convince the jury. Our review is complete if, as here, there is evidence in the record which if believed would support a punitive damages award beyond a reasonable doubt. Id.

Wharf also asserts the district court improperly declined to reduce or disallow the award pursuant to its authority under C.R.S. § 13-21-102(2)(a)-(c). The court properly considered Wharf's motion and rejected it based on Wharf's "utter disregard" of UIH. See Appellants' App. at 2092. Contrary to Wharf's assertion, § 13-21-102(2) does not "direct" a court to reduce a punitive damages award if the conduct has ceased, the deterrent effect has been accomplished, or the purpose of punitive damages has been otherwise served. The statute grants the district court discretion ("court may reduce or disallow the award"). If a

49

punitive damages award is supported by sufficient evidence and not "grossly excessive" under the Constitution, the decision to let the award stand is a matter within the discretion of the district court.

Wharf finally argues the punitive damages award is unconstitutional. The question of whether the punitive damages award comports with state law is separate from the determination of whether it complies with the Due Process Clause of the Fourteenth Amendment. In BMW of North America, Inc. v. Gore, the Supreme Court refined the analysis used to determine if a punitive damages award is "grossly excessive" and thus unconstitutional. 517 U.S. 559, 562 (1996). We review this issue de novo. FDIC v. Hamilton, 122 F.3d 854, 857 (10th Cir. 1997).

Under BMW, we engage in a multi-step analysis to determine if an award is constitutionally infirm. Initially, we identify the State interests that a punitive damages award is designed to serve. 517 U.S. at 568. "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." Id. See Lexton-Ancira Real Estate Fund v. Heller, 826 P.2d 819, 822 (Colo. 1992) (stating the general purposes of punitive damages are punishment of the defendant and deterrence against the commission of similar offenses by the defendant and others in the future). Next, we determine if the defendant received "fair notice not only of the

50

conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." Id. at 574. Three factors guide our analysis of whether a defendant received adequate notice of the magnitude of the penalty that might be imposed: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of the punitive damages award to the actual or potential harm inflicted on the plaintiff; and (3) a comparison of the punitive damages award with the civil or criminal penalties that could be imposed for comparable misconduct. Id. at 583. See Deters v. Equifax Credit Information Servs. , 202 F.3d 1262, 1272 (10th Cir. 2000).

Viewed in the light most favorable to UIH, the evidence depicts reprehensible conduct. The jury found Wharf deliberately misled UIH to secure for itself a sought-after license worth at least $500,000,000. Wharf's deliberate misrepresentations and nondisclosures were not limited to a single episode but occurred repeatedly over a protracted period of time. Wharf used UIH's name, contacts, and expertise (all given with an understanding that UIH would have a right to invest in CNCL) to obtain the franchise and then used its financial and negotiating leverage to string on UIH for several months. UIH's injury admittedly was economic in nature and thus less worthy under BMW of a punitive damages award. See BMW, 517 U.S. at 576. The nature of the injury, however, is just one factor among many. "[I]nfliction of economic injury,

51

especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." Id. There was sufficient evidence here to support a conclusion that Wharf's affirmative acts of misconduct were intentional.

We next consider the ratio of the punitive damages award to the actual or potential harm to the plaintiff. Although the Court eschewed any precise mathematical formula in BMW, it appeared to consider any punitive damages award more than ten times the amount of either the actual *or* potential harm to the plaintiff to be dangerously close to the boundary of constitutional infirmity. 517 U.S. at 581. This factor weighs compellingly in favor of UIH. The $58,500,000 punitive damages award, although large, was only 87% of the $67,000,000 compensatory damages award. Only in rare circumstances will we find a punitive damages award to be "grossly excessive" where the ratio of the punitive award to the compensatory award is less than 1:1. See Hamilton, 122 F.3d at 861 (finding a 6:1 ratio permissible in a purely economic injury case). There is no precise ratio that is excessive as a matter of law. Post Office v. Portec, Inc., 913 F.2d 802, 810 (10th Cir. 1990).

Last, we compare the punitive damages award to the amount of civil and criminal penalties that could be imposed on Wharf for comparable misconduct. A person or entity violating the Securities Exchange Act is subject to penalties of

fine and imprisonment. A fine of up to $2,500,000 may be imposed upon a corporate entity. Natural persons may not be fined more than $1,000,000, but may be imprisoned for up to ten years. See 15 U.S.C. § 78ff(a). The Colorado Securities Act likewise permits fines of up to $750,000 and imprisonment between four and sixteen years for willful violations of its provisions. See C.R.S. § 11-51-603; C.R.S. § 18-1-105. The fines are relatively stiff, but obviously not as severe from a financial point of view as the amount of punitive damages levied against Wharf. This fact alone, however, does not compel reduction of the punitive damages award. Comparison of the award to civil or criminal penalties is only one of the indicators of whether a defendant is on notice of the magnitude of the award that may be imposed based on the defendant's misconduct. In Colorado, a defendant is on notice of the magnitude of the penalty by virtue of C.R.S. § 13-21-102(1)(a). That section generally prohibits a punitive damages award in excess of the compensatory award. Thus, a defendant is on notice that a potential punitive award varies with the magnitude of the actual harm caused by the defendant, but only rarely will it exceed the amount reflective of the actual harm. In other words, the greater the harm, economic or otherwise, inflicted by the defendant, the greater the potential punitive award.

We agree that the punitive damages award here is large. However, it is

53

only 87% of the compensatory damages award and is a product of the immensity of UIH's loss.  Coupled with the reprehensible nature of Wharf's conduct, the award was not "grossly excessive" in violation of the Fourteenth Amendment.

**Prejudgment interest**

Wharf contends the district court erred in awarding UIH $28,208,440 in prejudgment interest.  The district court awarded prejudgment interest on the compensatory damages award at eight percent interest from October 31, 1992, to May 21, 1997, the date of entry of judgment.

In Colorado, a prevailing party is entitled to prejudgment interest "[w]hen money or property has been wrongfully withheld."  C.R.S. § 5-12-102(1)(a).  "[I]nterest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property from the date of wrongful withholding to the date of payment or to the date judgment is entered, whichever first occurs."  Id.  Section 5-12-102 is broadly construed "to effectuate the legislative purpose of compensating parties for the loss of money or property to which they are entitled."  Westfield Dev. Co. v. Rifle Inv. Assocs., 786 P.2d 1112, 1122 (Colo. 1990).  Whether a particular factual circumstance falls within the terms of the prejudgment interest statute is a question of law reviewed de novo.  See Frontier Exploration, Inc. v. American Nat'l Fire Ins. Co., 849 P.2d

54

887, 893 (Colo. App. 1992).

Wharf contends § 5-12-102 is not applicable here because nothing was "wrongfully withheld" as UIH claims only a "right to future income." See Bennett v. Greeley Gas Co., 969 P.2d 754, 766 (Colo. App. 1998) ("prejudgment interest may not be awarded for future lost profits or earnings"). We disagree. It is settled in Colorado that "one who is damaged by a breach of contract is entitled to recover prejudgment interest of eight percent annually from the time of the breach." Ballow v. PHICO Ins. Co., 878 P.2d 672, 684 (Colo. 1994). Likewise, "one who is damaged by a breach of [fiduciary] duty may recover prejudgment interest from the date of the breach, since it is the breach itself that makes the conduct wrongful." Vento v. Colorado Nat'l Bank, 907 P.2d 642, 647 (Colo. App. 1995). Section 5-12-102 is not limited to breaches of either contract or fiduciary duty. As we have observed, "[i]t would appear . . . that victims of tortious conduct are clearly entitled to prejudgment interest under the statute." Estate of Korf v. A.O. Smith Harvestore Prods., Inc., 917 F.2d 480, 486 (10th Cir. 1990). Because UIH prevailed on its contract and tort claims, it is entitled to prejudgment interest under C.R.S. § 5-12-102.

**Post-judgment issues – contempt and sanctions**

Federal Rule of Civil Procedure 62(a) provides that a prevailing party may

55

not execute a judgment until ten days after the entry of judgment. Even after the expiration of ten days, execution of a judgment is stayed pending appeal once the appellant files a supersedeas bond. Fed. R. Civ. Pro. 62(d). Wharf did not satisfy the judgment within ten days or file a supersedeas bond, despite its undisputed financial ability to do so. UIH sought execution of the judgment after obtaining leave from the court to register the judgment under 28 U.S.C. § 1963. After learning that Wharf was in the process of selling a hotel in California, UIH filed a motion in the United States District Court for the Central District of California for an order that UIH was entitled to the sale proceeds. The court granted the motion. In defiance of the order, Wharf closed the sale and transferred the funds from the United States. Next, UIH propounded interrogatories in an attempt to identify Wharf's assets in the United States. Wharf's responses to the interrogatories indicated it had less than $50,000 in bank accounts in New York.

On July 23, 1997, UIH filed a Motion for Assistance in Connection with a Writ of Execution. The motion sought a turnover order commanding Wharf to deliver certain personal property consisting of various foreign bank accounts and stock certificates to the United States Marshal for the District of Colorado. A magistrate judge granted the motion pursuant to his authority under Federal Rule of Civil Procedure 69(a) and Colorado Rule of Civil Procedure 69(g). The

magistrate directed Wharf to collect $150,000,000 of assets in Hong Kong and Singapore and transfer them to the clerk of the court. Wharf filed objections and the district court entered an order staying enforcement of the order until a hearing could be held. The district court conducted a hearing on October 23 and affirmed the magistrate's order. The court rejected Wharf's contention that the turnover order provided UIH undeserved injunctive relief, and reiterated that "Wharf can avoid all of this difficulty by posting a supersedeas bond." Appellants' App. at 2121. Wharf did not comply with the turnover order and its motion for stay of the order was denied.

On November 17, the district court entered an order directing Wharf to show cause why it should not be held in contempt of court. At a hearing on December 4, the court ruled that Wharf willfully and inexcusably was in contempt of court. The court required that Wharf pay UIH's attorney fees in connection with the post-judgment proceedings. The attorney fee order was not subject to vacatur. Further, the court allowed Wharf to purge itself of contempt if it posted a supersedeas bond within ten days from the date of the hearing. Also, the court imposed a daily monetary contempt sanction equivalent to the amount of the daily interest accruing on the judgment. The court cautioned Wharf that after expiration of the ten-day grace period, the accruing monetary sanction would not be vacated under any circumstances. The sanction was to

57

continue until Wharf posted a supersedeas bond or complied with the turnover order.

Wharf did not post a supersedeas bond by the end of the ten-day grace period. The court issued an order reiterating the sanction and advising Wharf the sanction was no longer subject to vacatur. At a hearing on December 22, the court considered alternative measures and added additional provisions to its contempt order after counsel advised that Wharf had not posted a supersedeas bond. First, the court barred Wharf from seeking equitable relief from the court as long as Wharf remained in contempt. Second, the court ruled:

> Wharf Holdings shall not, directly or through any person or entity under its direct or indirect control, transact any business . . . with any bank, brokerage, or other institution, wherever located, that (a) is in the business of loaning money, raising money for the benefit of others, accepting money or other property for deposit, or transferring or facilitating the transfer of money or property for the benefit of others, and (b) is chartered or incorporated or maintains a branch or office in the United States, including without limitation [numerous banks].

Id. at 2233-34. Under the terms of the court's order, "transacting business" included depositing, receiving, or transferring money from any of the long list of financial institutions.

In mid-January 1998, Wharf sought to obtain a supersedeas bond. The court ordered cessation of accrual of contempt sanctions and, on January 27, approved Wharf's supersedeas bond and ordered UIH to stay enforcement

58

proceedings against Wharf pending appeal. The court vacated its October 23, 1997, turnover award. At the time the contempt sanctions ceased, $944,233.10 in contempt sanctions and $144,457.91 in attorney fees had accrued.

Wharf appeals the imposition of the sanctions and fees. Wharf urges us to reverse and vacate the district court's order because (1) the court lacked subject matter jurisdiction over the underlying matter; (2) the turnover order constituted improper use of equitable relief to assist money judgment creditors in the collection of judgments; and (3) the turnover order violated principles of extraterritoriality and international comity. We review the district court's interpretation of Colorado law de novo. See Gust v. Jones, 162 F.3d 587, 591 (10th Cir. 1998).

The plain language of Federal Rule of Civil Procedure 69(a) unambiguously permits a federal district court sitting in Colorado to reference and apply Colorado law in "proceedings on and in aid of execution," unless a federal statute governs such proceedings. "Federal Rule of Civil Procedure Rule 69(a) . . . defers to state law to provide methods for collecting judgments." Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 834 (1988). As a result, the district court's turnover order was valid if authorized by Colorado law. See 12 Charles A. Wright et al., Federal Practice and Procedure, § 3012 (1997), at 148. Colorado Rule of Civil Procedure 69(g) provides:

59

The court, master, or referee may order any party or other person over whom the court has jurisdiction, to apply any property other than real property, not exempt from execution, whether in the possession of such party or other person, or owed the judgment debtor, towards satisfaction of the judgment. Any party or person who disobeys an order made under the provisions of this Rule may be punished for contempt. Nothing in this Rule shall be construed to prevent an action in the nature of a creditor's bill.

Colorado clearly recognizes that "[i]ssuance of a writ of execution . . . is not an exclusive remedy, and the plaintiff . . . therefore [is] entitled to employ supplemental proceedings in aid of execution to collect the judgment from the defendants' property." First Nat'l Bank of Denver v. District Court, 652 P.2d 613, 617 (Colo. 1982). Rule 69(g) gives effect to this entitlement and permits entry of a turnover order comparable to the order entered by the district court here.[3] See Hudson v. American Founders Life Ins. Co., 417 P.2d 772 (Colo. 1966) (construing former Rule 69(f)).

Wharf argues the turnover order was in effect a mandatory injunction entered by the court without making the factual findings that are a prerequisite to a grant of injunctive relief. Under the plain language of Federal Rule 69(a), such factual findings are necessary only if compelled by the provisions of a federal

---

[3] The host of cases cited by Wharf are not to the contrary. Those cases all involved reversal of district court enforcement actions that were invalid because the actions taken were not authorized by or effectuated in accordance with state law. See, e.g., Aetna Cas. & Sur. Co. v. Markarian, 114 F.3d 346, 349-50 (1st Cir. 1997); Hilao v. Estate of Marcos, 95 F.3d 848, 856 (9th Cir. 1996).

60

statute or the applicable state rules for execution of judgments. Wharf has not directed us to any authority interpreting Colorado law as requiring a district court to make factual findings sufficient to warrant injunctive relief before acting under Colorado Rule 69(g).

Wharf also asserts the turnover order conflicts with principles of extraterritoriality and the comity of nations. Extraterritoriality principles limit the United States' ability to hold a party legally accountable for conduct that occurred beyond its borders. Here, the district court merely directed a party over whom it had personal jurisdiction to turn over assets. The location of those assets is irrelevant. See In re Simon, 153 F.3d 991, 997 (9th Cir. 1998). "Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under its control, whether the property be within or without the United States." United States v. First Nat'l City Bank, 379 U.S. 378, 384 (1965). Comity "counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law." United States v. Nippon Paper Indus. Co., 109 F.3d 1, 8 (1st Cir. 1997). Wharf has not offered a compelling reason to justify overruling the turnover order on comity grounds. Compliance with the turnover order did not require Wharf to violate Hong Kong law, nor did it preclude Wharf from satisfying its obligations

61

elsewhere. At best, Wharf has demonstrated that its willful noncompliance with the turnover order led to complications between Wharf and its banks. The fault in that regard lies with Wharf, not the district court.

Having determined that the district court had authority to enter the turnover order, we next determine if it acted properly in holding Wharf in contempt for failure to comply with that order. We review a finding of civil contempt under an abuse of discretion standard. O'Connor v. Midwest Pipe Fabrications, Inc., 972 F.2d 1204, 1209 (10th Cir. 1992). A district court has broad discretion in using its contempt power to require adherence to court orders. Id.

Wharf argues the district court improperly used its contempt power to force compliance with a money judgment. This argument misconstrues the nature of the court's order. The court held Wharf in contempt for failing to comply with the court's properly entered turnover order. Colorado has specifically contemplated a finding of contempt and imposition of sanctions for failing to comply with a turnover order.

> To be sure, in the course of execution proceedings upon such a [money] judgment, a court may enter ancillary orders directing that the judgment debtor take certain actions, including the transfer of property. A willful failure to comply with such an order could furnish the predicate for the imposition of remedial or punitive sanctions.

In re Marriage of Nussbeck, 949 P.2d 73, 77 (Colo. App. 1997), reversed on other grounds, 974 P.2d 493 (Colo. 1999).

62

The district court did not abuse its discretion in finding Wharf in contempt of court and in imposing sanctions. Nothing more was required of Wharf than of any other litigant. A party against whom judgment is entered may either satisfy the judgment or post a supersedeas bond. Wharf opted to do neither. Its decision to ignore the turnover order was willful by its own admission. Wharf indisputably had sufficient financial resources either to satisfy the judgment or to post a supersedeas bond.

AFFIRMED.